949 P.2d 1366 (1998)
134 Wash.2d 188
William GERBERDING; Kemper Freeman, Jr.; Common Cause of Washington; Association of Washington Cities; Paul Sutley; Shirley Doty; Timothy Kaufman-Osborn; Arthur Siegal; Tom Gregory; Ida Ballasiotes; Bob McCaslin; Alex Deccio; Valoria Loveland; Helen Sommers; and Marlin Appelwick, Petitioners,
v.
Ralph MUNRO, Secretary of State; and Christine O. Gregoire, Attorney General, Respondents,
U.S. Term Limits, Inc.; Citizens for Leaders with Ethics and Accountability Now, Inc. (CLEAN), Respondents/Intervenors.
No. 65059-4.
Supreme Court of Washington, En Banc.
Argued October 15, 1997.
Decided January 8, 1998.
*1367 Brent D. Boger, Robin L. Rivett, Deborah La Fetra, Sacramento, CA, amicus curiae for Pacific Legal Foundation.
Perkins, Coie, David Burman, Nancy Day, Seattle, for Petitioners.
Christine Gregoire, Attorney General, James Pharris, Jeffrey Even, Anne Egeler, Assistant Attorneys General, Olympia, Marten & Brown, Stimson Bullitt, Appel & Glueck, William Glueck, Seattle, for Respondents.
TALMADGE, Justice.
We are asked in this original action for a writ of mandamus to evaluate the constitutionality of those portions of Initiative 573 (the Term Limits Law) effectively placing term limits on certain state constitutional officers. Initiative 573 prevents individuals who have held state legislative seats or certain state constitutional offices[1] for a prescribed *1368 period of time from filing a declaration of candidacy and appearing on the ballot for such offices, although write-in campaigns are permitted. Such restrictions are qualifications beyond those set forth in the Washington Constitution for such offices, and the Legislature or the people acting in their legislative capacity may not add statutory qualifications to those prescribed for state constitutional officers. We find Initiative 573 unconstitutional and issue a writ of mandamus to the secretary of state directing him to accept declarations of candidacy, notwithstanding Initiative 573.

ISSUES
1. Are the provisions of Initiative 573 pertaining to state constitutional officers severable from the provisions pertaining to federal legislators which have been found unconstitutional by federal courts?
2. Do the restrictions on declarations of candidacy and appearance on the ballot for certain candidates with prior office holding experience set forth in Initiative 573 constitute qualifications for state constitutional offices?
3. May qualifications for state constitutional officers beyond those set forth in the Washington Constitution be added by statute?
4. Does Initiative 573 amend the Washington Constitution?

FACTS
In 1992, Washington voters approved Initiative 573, the Term Limits Law, by a 52 percent majority. That initiative restricted access to the ballot for incumbent state and federal office holders. Section 1 of Initiative 573 sets forth the perceptions upon which enactment of the initiative was based:[2]
(1) The people will best be served by citizen legislators who are subject to a reasonable degree of rotation in office;
(2) Entrenched incumbents have become indifferent to the conditions and concerns of the people;
(3) Entrenched incumbents have an inordinate advantage in elections because of their control of campaign finance laws and gerrymandering of electoral districts;
(4) Entrenched incumbency has discouraged qualified citizens from seeking public office;
(5) Entrenched incumbents have become preoccupied with their own reelection and devote more effort to campaigning than to making legislative decisions for the benefit of the people;
(6) Entrenched incumbents have become closely aligned with special interest groups who provide contributions and support for their reelection campaigns, give entrenched incumbents special favors, and lobby office holders for special interest legislation to the detriment of the people of this state, and may create corruption or the appearance of corruption of the legislative system;
(7) The people of Washington have a compelling interest in preventing the self-perpetuating monopoly of elective office by a dynastic ruling class.
....
Laws of 1993, ch. 1, § 1. This preamble to Initiative 573 strongly implies its purpose is to make incumbents ineligible for specified state constitutional offices. See RCW 29.15.240.
Under the initiative, persons who have served for 8 or more of the last 14 years (measured from the end of current term of office) for governor or lieutenant governor may not file a declaration of candidacy or appear on the ballot for such offices. RCW *1369 43.01.015. Similar restrictions, with variations in the years of service, are established for state legislators, RCW 44.04.015; United States representatives, RCW 29.68.015; and United States senators, RCW 29.68.016. The secretary of state may not accept declarations of candidacy or nomination papers, or permit a person's name to appear on the ballot if the person is subject to these restrictions. RCW 29.15.240(1).[3] Citizens suits are allowed to enforce Initiative 573. RCW 7.16.370.[4]
Initiative 573 permits the people to write in the name of a candidate, notwithstanding the restrictions it establishes. RCW 29.51.173. But the effect of such a write-in campaign is limited. If the incumbent write-in candidate wins his or her party's nomination, the candidate is still barred from the general election ballot and the Voters' Pamphlet. See RCW 29.15.240(1); RCW 29.80.010. Thus, the candidate must mount a second write-in campaign for the general election.[5]
Upon its enactment, Initiative 573 was challenged in federal court with respect to its effect on federal officers. Sections 4, 5, and 8 relating to United States senators and representatives were invalidated by the federal courts. See Thorsted v. Gregoire, 841 F.Supp. 1068 (W.D.Wash.1994), aff'd sub nom. Thorsted v. Munro, 75 F.3d 454 (9th Cir.1996). State constitutional officers were not at issue in the federal litigation.
The present original action was filed on March 21, 1997. The petitioners include voters, Common Cause of Washington, the Association of Washington Cities, and incumbent legislators. The respondents are Ralph Munro, the secretary of state, in his capacity as the state's chief elections officer, RCW 29.04.070, and the attorney general. The action seeks invalidation of the Term Limits Law and issuance of a writ of mandamus directing the secretary of state to allow incumbents access to the ballot. RAP 16.2(b). The secretary of state opposed the petition, arguing our consideration of Initiative 573 was premature. We, nevertheless, retained the petition. We granted the motion to intervene of public interest groups, U.S. Term Limits, Inc. (USTL) and Citizens for Leaders with Ethics and Accountability Now, Inc. (CLEAN). We also granted amicus curiae status to the Pacific Legal Foundation (PLF).

ANALYSIS
In addressing an original action, we are guided by the principles of RAP 16.2 regarding the filing of original actions against a state officer. The parties here have stipulated to the facts so that a factual reference hearing pursuant to RAP 16.2(d) is unnecessary. The case takes the same course of review as any other case where we accept review of a trial court decision. RAP 16.2(e).
The Washington Constitution confers original jurisdiction upon this Court in "mandamus as to all state officers." WASH. CONST. art. IV, § 4. Mandamus will not lie to compel a discretionary act, State ex rel. Burlington Northern, Inc. v. Washington State Utils. & Transp. Comm'n, 93 Wash.2d 398, 410, 609 P.2d 1375 (1980), nor lie to direct a state officer to generally perform constitutional duties. Walker v. Munro, 124 Wash.2d 402, 407-08, 879 P.2d 920 (1994). Mandamus will lie to compel a state officer to undertake a clear duty. Id. at 408, 879 P.2d 920; see also State ex rel. Burlington Northern, *1370 93 Wash.2d at 410, 609 P.2d 1375. We can declare a law unconstitutional in a mandamus action only if such a declaration is necessary to the issuance of the writ. See Walker, 124 Wash.2d at 409, 879 P.2d 920.
In this case, if we find Initiative 573 unconstitutional, mandamus will properly lie as to the Secretary of State. The Secretary is the chief elections officer for the state. RCW 29.04.070. The Secretary accepts declarations of candidacy for state executive officers, RCW 29.15.030(1), and legislators whose districts encompass multiple counties. RCW 29.15.030(2). The Secretary makes rules to facilitate the execution of election laws and assists local elections officers by devising uniform forms and procedures. RCW 29.04.080. The Secretary also prepares the official state Voters' Pamphlet, RCW 29.80.010, and certifies names of candidates for placement on the election ballot. See RCW 29.04.210(1), (8); RCW 29.30.101; RCW 29.79.230. Thus, the writ would compel the Secretary to undertake a clear legal duty, to accept declarations of candidacy and nominations papers, and certify for placement on the election ballot the names of candidates otherwise disqualified by Initiative 573.
Turning to the arguments raised by the parties in this case, petitioners assert Initiative 573 is unconstitutional, offering three arguments: (1) the term limit provisions for state constitutional officers cannot be severed from the unconstitutional federal legislator provisions; (2) Initiative 573 impermissibly adds to the exclusive list of qualifications contained in the Washington Constitution, which can only be altered by constitutional amendment; (3) Initiative 573 violates petitioners' rights of expression, suffrage, free association, and equal treatment under the Washington and United States Constitutions. Respondents assert the provisions of Initiative 573 at issue here are constitutionally valid. Intervenors and PLF contend Initiative 573 should be sustained on policy grounds.
In our analysis of the provisions of Initiative 573 we are guided by general principles for evaluating its constitutionality. First, the statute is presumed constitutional and parties challenging its constitutionality must demonstrate its unconstitutionality beyond a reasonable doubt. City of Seattle v. Montana, 129 Wash.2d 583, 589, 919 P.2d 1218 (1996); Erickson & Assocs., Inc. v. McLerran, 123 Wash.2d 864, 869, 872 P.2d 1090 (1994); State v. Brayman, 110 Wash.2d 183, 193, 751 P.2d 294 (1988). Second, while initiative measures are reflective of the reserved power of the people to legislate, Save Our State Park v. Hordyk, 71 Wash.App. 84, 89-90, 856 P.2d 734 (1993), the people in their legislative capacity remain subject to the mandates of the Constitution. Culliton v. Chase, 174 Wash. 363, 373-74, 25 P.2d 81 (1933). Finally, the Washington Constitution is a restriction on legislative power rather than a grant of powers. Moses Lake Sch. Dist. No. 161 v. Big Bend Community College, 81 Wash.2d 551, 555, 503 P.2d 86 (1972), appeal dismissed, 412 U.S. 934, 93 S.Ct. 2776, 37 L.Ed.2d 393 (1973); Fain v. Chapman, 89 Wash.2d 48, 53, 569 P.2d 1135 (1977).
A. Severability
The first issue advanced by petitioners is that because the provisions of Initiative 573 pertaining to federal legislators were found unconstitutional in Thorsted, 841 F.Supp. 1068, the provisions pertaining to state constitutional officers fail as well because they cannot be severed from the unconstitutional portions of the measure.
The basic test for severability of constitutional and unconstitutional provisions of legislation is set forth in Hall by Hall v. Niemer, 97 Wash.2d 574, 582, 649 P.2d 98 (1982) (quoting State ex rel. King County v. State Tax Comm'n, 174 Wash. 336, 339-40, 24 P.2d 1094 (1933)):
whether the constitutional and unconstitutional provisions are so connected ... that it could not be believed that the legislature would have passed one without the other; or where the part eliminated is so intimately connected with the balance of the act as to make it useless to accomplish the purposes of the legislature.
Accord Leonard v. City of Spokane, 127 Wash.2d 194, 201, 897 P.2d 358 (1995).
*1371 With respect to the first requirement, where a severability clause is present in legislation, we have found such a clause to provide the necessary assurance that the Legislature would have enacted the appropriate sections of the legislation despite the unconstitutional sections. State v. Anderson, 81 Wash.2d 234, 236, 501 P.2d 184 (1972). Initiative 573 contains a severability clause so that the first aspect of the severability test is met. See Laws of 1993, ch. 1, § 10.
As to the second requirement, petitioners assert the elimination of the unconstitutional portions of Initiative 573 pertaining to federal legislators so destroys the act as to render it incapable of accomplishing its intended purpose. They note the frequent references in the 1992 Voters' Pamphlet to "national issues" as to the intent of Initiative 573, claiming the term limits for federal legislators were essential to its enactment by the people. The 1992 Voters' Pamphlet refers to the national debt and tax burden, the S & L bailout and congressional banking and postal scandals. However, even a cursory look at the pamphlet reveals many references to state offices, referring to governor, lieutenant governor and state senators and representatives. Although the pamphlet notes several national issues, its lamentations regarding the evils of incumbency and elimination of "deadwood" can fairly be read as applying equally to the state constitutional officers addressed in the initiative. Thus, even without the portions relating to national office, as Initiative 573 addresses perceived evils of incumbency in state offices, it has not been rendered "useless," as required by the test for severability. Nor can it fairly be said that the state office provisions would not have been independently supported by the initiative proponents and voters seeking to address the perceived evils of incumbency at the local level. The second prong of the severability test is also met.
The provisions of Initiative 573 addressing state constitutional officers are severable, and are not unconstitutional per se because the provisions regarding federal legislators have been found by federal courts to violate the federal constitution.
B. Qualifications for State Constitutional Officers
The next question before us is whether the provisions of Initiative 573 are qualifications for state constitutional officers and whether the qualifications, set in the Washington Constitution for the officers in question, may be supplemented by statute.
1. Term Limits Are Qualifications
The threshold question we must answer is whether the restrictions set forth in Initiative 573 for certain candidates constitute "qualifications" for office. In the traditional sense, qualifications for office are attributes which must be met before a person can be a candidate for office or officeholder such as age, residence, or citizenship. The dictionary definition is "... [a] condition or circumstance which must be satisfied." Webster's II New Riverside University Dictionary 961 (1984). As the term itself is undefined in the Constitution, we apply its ordinary meaning. See Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 877, 784 P.2d 507 (1990) (undefined terms are given their "plain, ordinary and popular" meaning; and courts look to standard English language dictionaries to determine the ordinary meaning of such terms).
Initiative 573, however, frames the limitation in a negative sense, barring certain people from being candidates. A "negative" framing of the attribute does not preclude it from being a qualification. In Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the United States Supreme Court addressed U.S. CONST. art. I, § 2, cl. 2, the qualifications clause for members of the United States House of Representatives.[6] The Court rejected a contention that the negative phrasing of the qualifications clause prescribed standing incapacities only and did not impose further limits on the *1372 power of each house to judge its members' fitness for office. See Powell, 395 U.S. at 536-47, 89 S.Ct. at 1972-77. In holding the House was without power to exclude any member-elect who met the Constitution's requirements for membership, the Court recognized the qualifications clause provides an exclusive list of qualifications, notwithstanding its negative phrasing. Id. 395 U.S. at 536-38, 89 S.Ct. at 1972-73.
In State ex rel. Chandler v. Howell, 104 Wash. 99, 175 P. 569 (1918), we held the Washington Constitution's prohibition on judges seeking other offices during the term for which they were elected was a qualification that could not be added to those set for federal legislative office under the United States Constitution.
Moreover, under WASH. CONST. art. IV, § 3(a) (amend.25), judges have a mandatory retirement age of 75 years. Thus, framed more positively, a qualification for judicial office in Washington is that judges must be 75 years of age or younger.
While some proponents of term limits of the sort established by Initiative 573 have contended the restrictions on incumbents relate to ballot access, such restrictions have been interpreted to be qualifications for office. The United States Supreme Court in United States Term Limits, Inc. v. Thornton, 514 U.S. 779, 829-39, 115 S.Ct. 1842, 1867-71, 131 L.Ed.2d 881 (1995), rejected the view that an Arkansas constitutional amendment imposing term limits was a valid ballot access measure, and held term limits constituted a qualification for federal legislative office; such addition to the constitutional qualifications for federal office was invalid. See also Thorsted v. Gregoire, 841 F.Supp. 1068, 1081 (W.D.Wash.1994) (Initiative 573 imposes a new qualification for office: nonincumbency beyond the specified periods), aff'd sub nom. Thorsted v. Munro, 75 F.3d 454 (9th Cir.1996); Alaskans for Legislative Reform v. State, 887 P.2d 960, 966 (Alaska 1994) (rejecting Alaska's term limits' initiative because it imposed "`qualifications' as that term has been used by constitutional delegates, political thinkers, legal scholars, and courts").
Likewise in 1895, we interpreted the term limit provision of former article XI, section 7[7] as a qualification for county treasurers. In Koontz v. Kurtzman, 12 Wash. 59, 40 P. 622 (1895), an unsuccessful candidate for county treasurer challenged the election asserting the person elected was ineligible to hold office under former WASH. CONST. art. XI, § 7 alleging a partial term served by the treasurer pursuant to appointment should be counted in applying the term limit. In analyzing the issue, we treated the term limit as a qualification:
We are of the opinion that appellant was not disqualified from holding the second term under [article XI, section 7], in consequence of having served for a part of a term under the appointment by the commissioners. The constitution does not say that no person shall hold a county office for more than four years, but says that he shall not hold it for more than two terms in succession. It interposes a term limit but not a time limit. The term of office is fixed by law and is two years, and there may be several different incumbents during a single term.
Koontz, 12 Wash. at 60, 40 P. 622 (emphasis added).
Counsel for Respondents Munro and Gregoire effectively conceded the restrictions of Initiative 573 are qualifications in oral argument. As the intent section of the measure proclaims, and the effect of the measure commands, nonincumbency as described in Initiative 573 becomes a qualification for state constitutional officers, and we so hold.
2. Qualifications for State Constitutional Officers Are Exclusive
Having determined Initiative 573 establishes nonincumbency as a new qualification for state constitutional officers we next turn to the question of whether qualifications can be added by statute to the qualifications set forth in the constitution for such officers. Petitioners contend the qualifications mandated by Initiative 573 unconstitutionally add to the exclusive qualifications for state constitutional *1373 officers established in the Washington Constitution. Respondents, in turn, assert the negative phraseology of the Constitution indicates the qualifications for state constitutional officers are minimums to which the Legislature or the people may add by statute.
In determining whether term limits constitute impermissible qualifications beyond those expressed in our state Constitution, it is important to re-visit fundamental principles regarding qualifications for state constitutional offices. Our cases have expressed a strong presumption in favor of eligibility for office. In State v. Schragg, 158 Wash. 74, 78, 291 P. 321 (1930), we stated:
Since the right to participate in the government is the common right of all, it is the unqualified right of any eligible person within the state to aspire to any of these offices, and equally the unqualified right of the people of the state to choose from among those aspiring the persons who shall hold such offices. It must follow from these considerations that eligibility to an office in the state is to be presumed rather than to be denied, and must further follow that any doubt as to the eligibility of any person to hold an office must be resolved against the doubt.
Id. at 78, 291 P. 321. Accord State ex rel. O'Connell v. Dubuque, 68 Wash.2d 553, 566, 413 P.2d 972 (1966) ("[a] strong public policy exists in favor of eligibility for public office, and the constitution, where the language and context allows, should be construed so as to preserve this eligibility").
The Washington Constitution sets forth qualifications for state legislative offices:
Qualifications of Legislators. No person shall be eligible to the legislature who shall not be a citizen of the United States and a qualified voter in the district for which he is chosen.
WASH. CONST. art. II, § 7. Similarly, the Constitution establishes qualifications for state executive officers:
Qualifications, Compensation, Offices Which May Be Abolished. No person, except a citizen of the United States and a qualified elector of this state, shall be eligible to hold any state office....
WASH. CONST. art. III, § 25 (amend.31). The history of these provisions indicates they were meant to be the exclusive qualifications for such state constitutional officers.
The constitutional provisions establishing qualifications for state constitutional officers were the subject of intense debate in the 1889 Constitutional Convention. The original draft of article III, section 25, provided a general residency in Washington requirement of two years in addition to other qualifications. For the governor and lieutenant governor, a minimum age of 35 years and a five-year Washington residency requirement were established. This draft of the section was ultimately rejected. See The Journal of the Washington State Constitutional Convention 1889, at 589-91 (Beverly Paulik Rosenow ed., 1962).
Term limits were also debated, and in some cases applied, when qualifications for certain state offices were being determined. As originally adopted in 1889, WASH. CONST. art. III, § 25, provided in part:
No person, except a citizen of the United States and a qualified elector of this state shall be eligible to hold any state office, and the State Treasurer shall be ineligible for the term succeeding that for which he was elected ...
(Emphasis added.) Journal at 589-90.[8] Similarly, former WASH. CONST. art. XI, § 7, initially provided:
No county officer shall be eligible to hold his office more than two terms in succession.
Journal at 720.[9]
Delegates at the 1889 Constitutional Convention considered but rejected term limits for other offices. Journal at 589-91. When article III, section 25, was being considered in July of 1889, delegate J.Z. Moore moved to *1374 amend the section to make the governor as well as the treasurer ineligible for a succeeding term. The Convention considered but rejected imposition of a term limit for the office of governor. Id. at 591. In addition, delegate Suksdorf moved "that no other state officer should hold office for more than two terms in succession." Id. The Convention also defeated this motion. Id.
A similar process took place at the 1889 Convention in addressing article II, section 7. The actual qualifications for state legislators came only after several motions to change the section by convention delegates. The initial draft of that section required a legislative candidate to be a citizen of the United States, a resident of the state for two years, and a qualified voter of the district where she or he is chosen; provided, that at the first election every citizen of the United States who was a qualified voter when elected was eligible. A motion by delegate Griffiths to strike the two-year residence qualification failed. A subsequent motion by delegate T.M. Reed to strike language drawing a distinction between the eligibility of candidates at the first and subsequent elections carried. A motion to strike the entire section by delegate P.C. Sullivan lost, and a final motion by delegate Dunbar to "amend so that a member of Legislature must be a citizen of the United States and an elector of the state, leaving out the two-year requirement of residence" carried. Journal at 240, 527-28.
Washington's constitutional framers believed qualifications for state constitutional officers were a matter of constitutional, not statutory, concern. They debated citizenship, residency in the state, age, status as qualified elector, and term limits in ultimately arriving at the appropriate qualifications for state constitutional officers.
Additionally, the framers did not confer authority on the Legislature to prescribe additional qualifications for such officers. Various constitutional provisions demonstrate the framers knew how to grant, and expressly did grant the Legislature lawmaking authority pertaining to certain constitutional offices. See, e.g., WASH. CONST. art. III, §§ 19-23 (establishing constitutional offices and providing such officers shall perform duties "as may be prescribed by law," thereby expressly delegating to the Legislature the power to fix the officers' duties). See also WASH. CONST. art. IV, § 3(a) (amend.25) (setting mandatory retirement age for judges but authorizing Legislature to fix a lesser age). Article III, § 25 itself allows the Legislature to abolish certain offices by statute. The framers were careful to spell out the extent of legislative power over other constitutional offices, indicating that if the framers intended the Legislature to have authority to add to the qualifications of WASH. CONST. art. II, § 7, and art. III, § 25, they would have so stated.
In addition to the text of the Constitution itself and our constitutional history, our case law indicates the qualifications sections of the Washington Constitution are exclusive. In In re Bartz, 47 Wash.2d 161, 287 P.2d 119 (1955), we stated the general rule with respect to constitutional qualifications for office:
where the constitution has set forth qualifications for an office, either general or specific, in the absence of an express grant of power to the legislature, there is an implied prohibition against the imposition of additional qualifications by the legislature.
Bartz, 47 Wash.2d at 164, 287 P.2d 119.
In Bartz, we upheld a statute requiring justices of the peace in cities of over 5,000 population to be attorneys. We noted the specific constitutional qualifications for executive and legislative office and held where the Constitution failed to provide qualifications regarding justices of the peace, the legislature could appropriately fill the vacuum because enactment of such laws would not conflict with any express or implied constitutional provision. We indicated this holding was consistent with the concept of the Washington Constitution as a restriction on legislative powers, and followed from the authority expressly granted the Legislature by WASH. CONST. art. IV, § 10 (amend.65) to determine the powers, duties, and jurisdiction of justices of the peace. We also noted laws governing the qualifications of these officers had been in effect for many years at the time the state Constitution was adopted. Bartz, 47 Wash.2d at 166-68, 287 P.2d 119.
*1375 Under the general rule in Bartz, qualifications may not be supplemented by a legislative act where qualifications for the state officers have been expressly stated in article III, section 25 (regarding executive offices), and article II, section 7 (regarding legislative offices). This general rule has been repeatedly expressed in cases across the United States. 63C Am.Jur.2d Public Officers and Employees § 51, at 494-95 (1997), noting the general rule to be "where the constitution establishes specific eligibility requirements for a particular constitutional office, the constitutional criteria are exclusive." See, e.g., Alaskans for Legislative Reform v. State, 887 P.2d 960, 966 (Alaska 1994) (Alaska's Constitution sets forth qualifications for legislative office and term limits may not be added thereto by initiative); Reale v. Board of Real Estate Appraisers, 880 P.2d 1205, 1206-08 (Colo.1994) (collecting cases and noting: "The law is well established that, where a state constitution provides for certain officials and names the qualification for such officers, the legislature is without authority to prescribe additional qualifications."); Opinion of the Justices, 240 Mass. 611, 614, 135 N.E. 305 (1922) (where qualifications of voters or officers are fixed by the Constitution the Legislature cannot add to or subtract from them); Pavlak v. Growe, 284 N.W.2d 174, 180 (Minn.1979) (holding fair campaign statute void as imposing an additional qualification for office not specified by the Constitution); Imbrie v. Marsh, 3 N.J. 578, 585-86, 71 A.2d 352, 18 A.L.R.2d 241 (1950) (collecting authorities and noting "The recognized authorities on public law are in accord: `It would seem but fair reasoning upon the plainest principles of interpretation, that when the Constitution established certain qualifications as necessary for office, it meant to exclude all others as prerequisites ...'". "`The legislature cannot add to the constitutional qualifications of an officer'."). Accord State ex rel. Powers v. Welch, 198 Or. 670, 672-73, 259 P.2d 112, 114 (1953); Whitney v. Bolin, 85 Ariz. 44, 47, 330 P.2d 1003, 1005 (1958); Thomas v. State ex rel. Cobb, 58 So.2d 173, 184, 34 A.L.R.2d 140 (Fla.1952); State v. Betensen, 14 Utah 2d 121, 378 P.2d 669 (1963); State ex rel. Palagi v. Regan, 113 Mont. 343, 126 P.2d 818, 826 (1942); Gibbany v. Ford, 29 N.M. 621, 225 P. 577, 578 (1924); Cornell v. McAlister, 121 Okla. 285, 249 P. 959, 961 (1926). See also People ex rel. Hoyne v. McCormick, 261 Ill. 413, 423, 103 N.E. 1053, 1057 (1913); League of Women Voters of Mass. v. Secretary of Commonwealth, 425 Mass. 424, 430, 681 N.E.2d 842, 846 (1997) (rejecting the contention that the people by initiative alone can alter the qualifications for such office prescribed by the constitution, the Supreme Judicial Court of Massachusetts opined: "The idea that constitutionally prescribed qualifications may be changed only by constitutional amendment is intuitively sound."). Contra, League of Women Voters v. Secretary of State, 683 A.2d 769 (Me.1996) (upholding statute, enacted by initiative, adding to qualifications of state constitutional officers).
Respondents assert the "better-reasoned" decisions of other state courts support the conclusion the qualifications for state constitutional officers listed in the Washington Constitution are not exclusive. Relying on annotations appearing in Legislative Power to Prescribe Qualifications for or Conditions of Eligibility to Constitutional Office, 34 A.L.R.2d 155, 167 (1954), they argue constitutional provisions phrased positively are exclusive lists of qualifications, while those phrased negatively, like Washington's, are minimum requirements. Whether phrased negatively or positively, such requirements are qualifications. The critical issue is whether such qualifications are exclusive.
Respondents also argue "Courts interpreting provisions constructed similarly to Washington's have often concluded that additional qualifications can be added by statute." Br. of Resp't at 18-19. They cite four cases from the annotations, Boughton v. Price, 70 Idaho 243, 215 P.2d 286 (1950); Darrow v. People, 8 Colo. 417, 8 P. 661 (1885); State v. Johnson, 33 Del. 334, 138 A. 280 (Super.Ct.1927); and State ex rel. Thompson v. McAllister, 38 W.Va. 485, 18 S.E. 770 (1893), while noting "[i]n candor to the tribunal, however, the annotation also notes a number of cases from other states for the opposite proposition." Br. of Resp't at 19 n. 20. Indeed, we specifically noted the Boughton case and rejected its approach in Bartz. See *1376 Bartz, 47 Wash.2d at 164, 287 P.2d 119. The other cases are readily distinguishable. Darrow, Johnson and Thompson involve statutorily-added qualifications to a "statutorily created office" and are thus inapposite. The very annotation upon which respondents rely distinguishes the Legislature's power over statutory offices as opposed to constitutional offices, noting:
It is generally considered that the legislature has full control over offices created by its enactment of a statute, whereas its power over constitutional offices is limited; and that it cannot abolish a constitutional office, nor change such an office, except as expressly permitted by the constitution.
34 A.L.R.2d at 168 (citation and footnote omitted). Indeed, although respondents cite the Johnson case, upholding the Delaware Legislature's addition of qualifications to the statutory office of levy court commissioner, they overlook the annotation's discussion of the later case of Buckingham v. State ex rel. Killoran, 42 Del. 405, 35 A.2d 903 (1944), in which the Delaware court rejected legislatively-imposed additional qualifications on constitutionally created judicial offices stating:
We are convinced from all the authorities that the Legislative branch of government has no authority to add further qualifications in connection with a constitutional judicial officer where the qualifications are provided by the Constitution.
34 A.L.R.2d at 188 (quoting Buckingham, 42 Del. at 415, 35 A.2d at 907). This latter pronouncement by the Delaware court is in accord with our approach in Bartz.
Intervenors argue the qualifications listed in the Constitution are minimums which may be added to by statute, listing several statutory examples. These statutes do not support their position. RCW 43.10.010 requires the attorney general to be a qualified practitioner of the supreme court of this state. This qualification can be traced to Laws of 1887-88, § 3, at 7, which noted the "attorney general of this Territory shall be learned in the law and shall be a qualified practitioner before the supreme and district courts of this Territory." This then existing qualification was recognized by the Washington Constitution upon its adoption in 1889 via art. XXVII, § 2, which recognized and retained all territorial laws then in effect. See WASH. CONST. art. XXVII, § 2; In re Bartz, 47 Wash.2d 161, 167, 287 P.2d 119 (1955); State v. Estill, 55 Wash.2d 576, 582, 349 P.2d 210, 89 A.L.R.2d 1251 (1960) (Mallery, J., concurring) (noting the provisions of WASH. CONST. art. XXVII, § 2, and stating: "Territorial laws have a specific constitutional sanction and approval which subsequent state statutes do not have").
Intervenors also claim that judges in Washington are disqualified from office at age 75, citing RCW 2.10.100(3). This statute, part of the RCW Ch. 2.10 provisions regarding the judicial retirement system, merely echoes a constitutional requirement found at WASH. CONST. art. IV, § 3(a) (amend.25). The mandatory retirement age for judges is constitutionally, not statutorily prescribed.[10]
*1377 RCW 29.65.010(4) cited by intervenors is not even a qualification for state office. That statute provides an avenue by which any registered voter may contest any election to public office where the person elected gave or offered a bribe to a voter, inspector, or judge of election for the purpose of procuring his election. RCW 29.65.010(4). This statute addresses unlawful voting irregularites, not qualifications for office.
The general rule in Bartz remains the applicable principle as to statutory additions to qualifications for constitutional offices. Where the framers established qualifications for office, did not confer express authority upon the Legislature to add to such qualifications by statute, and specifically debated term limits, rejecting such qualifications for the officers in question, we must conclude that article II, section 7 and article III, section 25 are exclusive. Washington's constitutional framers evidenced an intent to allow broad eligibility for public office in setting the qualifications for state constitutional officers. We believe it the wiser course to adopt the general rule expressed in Bartz and not allow the qualifications for state constitutional officers to be easily altered by the particular politics of the moment.
C. Initiative 573 Did Not Amend the Constitution
The intervenors claim the Washington Constitution can be amended by initiative. They contend "[e]ven if the Legislature lacks authority to qualify eligibility by term limits, the citizens have such authority through the initiative process." Intervenors Br. at 39. In this case, by its terms, Initiative 573 is a statutory enactment. It was not designed to amend either article II, section 7 or article III, section 25 of our Constitution. Initiative 573 did not and cannot add qualifications to those prescribed in the Washington Constitution for state officers.[11]

CONCLUSION[12]
Recognizing its political significance, we are not swayed in our analysis of Initiative 573 by the policy merits or demerits of term limits for officeholders. The wisdom of term limits is ultimately a policy decision for the voters of this state, through the process for constitutional amendment articulated in WASH. CONST. art. XXIII. Whether this Court thinks such choice wise, or results in the best or most effective state constitutional officers, is of no consequence. With or without Initiative 573, the people retain the ultimate power to limit election of incumbents: by the reasoned and determined exercise of their franchise, they may in their discretion evict incumbents from office at the next election. Our review here is limited to the issue of whether the voters acted in compliance with our state's Constitution in expressing their collective will.
Initiative 573 improperly attempts to add qualifications to constitutional offices by statute. A statute, whether adopted by the Legislature or the people, may not add qualifications *1378 for state constitutional officers where the Constitution sets those qualifications.
We hereby order that a writ of mandamus be issued to the Secretary of State, requiring him to accept declarations of candidacy and nomination papers and certify names of candidates for placement on the ballot, in accordance with existing election laws, notwithstanding Initiative 573.
DURHAM, C.J., and DOLLIVER, GUY, JOHNSON and MADSEN, JJ., concur.
SANDERS, Justice, dissenting.
If the constitution, by its language, purported to exclusively set the qualifications for public office I would yield to that higher law; however, it does not. This court is not above the very constitution which created it, and must always heed its voice. I dissent because the constitution requires no less.

The Constitutional Text
To test the majority's claim that the people may not impose limits upon the terms of their elected public servants we must repair to the words of the constitutional text as "[a]ppropriate constitutional analysis begins with the text and, for most purposes, should end there as well." Malyon v. Pierce County, 131 Wash.2d 779, 799, 935 P.2d 1272 (1997).[1] As Patrick Henry similarly expressed early in our nation's history, "A Constitution, sir, ought to be, like a beacon, held up to the public eye, so as to be understood by every man." Jean Edward Smith, John Marshall: Definer of a Nation 137 (1st ed.1996) (quoting letter dated May 7, 1784, from John Marshall to John Ambler in 1 Marshall Papers 122).
These clauses were worded negatively to prohibit anyone from holding office who does not possess the constitutionally minimum qualifications. Washington constitution article II, section 7, addressing state legislators, provides:
No person shall be eligible to the legislature who shall not be a citizen of the United States and a qualified voter in the district for which he is chosen.
And Washington constitution article III, section 25, addressing all other state officers, provides:
No person, except a citizen of the United States and a qualified elector of this state, shall be eligible to hold any state office.
The majority errs when it concludes negative constitutional language which sets a minimum exclusively sets a maximum as well.[2] To set a floor and ceiling, simultaneously, more appropriate language would state "all persons shall be eligible for office who are citizens and qualified voters." But it doesn't.[3]
*1379 State ex rel. Griffiths v. Superior Court, 177 Wash. 619, 33 P.2d 94 (1934) is dispositive. There a Seattle council member challenged a Seattle ordinance which disqualified officeholders from holding any second public office. The council member challenged the ordinance on the grounds it was prohibited by state statute which provided: "no person shall be competent to hold an elective office within the state or any of its political subdivisions, including that of school district, unless he be a citizen of the United States and of the state of Washington and an elector of such political subdivision." Id. at 623, 33 P.2d 94 (citing Rem.Rev.Stat. § 9929). The disqualified council member argued the state statute set the exclusive qualifications for city office, and, accordingly, the city could not add any qualifications.
But this court disagreed, holding the negatively worded language meant what it said by setting minimum qualifications and nothing more. Holding the city could add qualifications consistent with the state statute, the court held, "Section 9929 merely provides that no person shall be competent to hold elective office unless he possesses certain qualifications. It does not say that no other requirements shall be prescribed, nor does it say that the political subdivision therein named may not impose restrictions not inconsistent with the statute." Id. at 624, 33 P.2d 94.
Griffiths and today's majority read nearly identically worded qualification clauses to an opposite result. As the constitutional language is materially identical to the state statute (no person shall hold office unless... ), the same outcome is mandated: Such negatively worded qualification clauses set the minimum qualifications but do not limit legislative power to add further qualifications above that minimum.
Our starting point is the presumption that the State has the legislative power to act in any given field unless affirmatively restrained by the constitution. State ex rel. Distilled Spirits Institute, Inc. v. Kinnear, 80 Wash.2d 175, 181, 492 P.2d 1012 (1972) ("[T]he legislative power is absolute unless expressly or by fair implication limited in the constitution.") (citing State v. Fair, 35 Wash. 127, 76 P. 731 (1904)).[4]
If our constitution does not affirmatively limit the legislature's, or the people's, ability to set reasonable qualifications for office, the legislature's authority to do so is simply not so limited. Such was the generally recognized rule of law at the time of statehood: "where the constitution has made some provision [for qualifications for office], but not exclusive ones, the legislature may add such others as are reasonable and proper." Floyd R. Mechem, A Treatise on the Law of Public Offices and Officers § 66 (1890). Cf. State ex rel. Buttz v. Marion Circuit Court, 225 Ind. 7, 72 N.E.2d 225, 230, 170 A.L.R. 187 (1947) ("It has been held universally that in the absence of constitutional restrictions there may be qualifications imposed by the legislature for holding public office.") (citing Floyd R. Mechem, supra, §§ 64-68 (1890)). Many of our framers were lawyers and appreciated the nuances of language.[5] In matters of constitutional construction, courts prefer a construction
which will render every word operative, rather than one which may make some words idle and nugatory.

*1380 This rule is applicable with special force to written constitutions, in which the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication.
Thomas M. Cooley, A Treatise on the Constitutional Limitations 72 (6th ed. 1890) (footnotes omitted).
This analysis could and should end here, with the conclusion that our negatively worded qualification clauses[6] do not forbid legislative imposition of further qualifications, including term limits. We know that because the text says that.[7]
Yet the majority ignores the plain meaning of the constitutional text embarking instead upon a journey back in time to the constitutional convention in a vain effort to give the unambiguous words of our constitution another meaning. Majority at 1373. While such is ultimately unproductive,[8] notwithstanding, I posit, our constitutional history does nothing to alter the plain meaning of the constitutional clauses before us. This is necessarily so because it is not the subjective intent of our framers which matters but the plain meaning of the words ratified by the public in 1889. State v. Lister, 91 Wash. 9, 156 P. 858 (1916); Malyon v. Pierce County, 131 Wash.2d 779, 799 n. 31, 935 P.2d 1272 (1997); Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. Puget Sound L.Rev. 491, 510 (1984). The framers proposed, but the public disposed.

Constitutional History
At the time of the constitutional convention in 1889 Washington Territory was governed by the Organic Act. Under the Organic Act the Washington Territorial legislature was directed to set the qualifications for voting and holding office. 10 Stat. ch. 90, p. 172, § 5 (1853). The Organic Act, however, set the minimum qualifications by requiring office holders and voters alike be United States citizens at least 21 years of age. Id. § 5. The Organic Act provided:
the qualifications of voters and of holding office at all subsequent elections shall be such as shall be prescribed by the Legislative Assembly: Provided, That the right of suffrage and of holding office shall be exercised only by citizens of the United States above the age of twenty-one years....
Id. § 5.
Thus, in the beginning, qualifications for voting and office eligibility were treated the same: the minimum was set by the Organic Act, the remainder by the legislature. The new constitution, however, altered the scheme by treating qualifications for voting differently from qualifications for holding office. By unmistakable language voting qualifications were set exclusively; however, the new constitution retained the prior system's treatment of qualifications for office by setting constitutional minimums for eligibility, leaving the legislature free reign to set all remaining qualifications.
The voting qualification enshrined in the new constitution affirmatively stated:
All male persons of the age of twenty-one years or over, possessing the following qualifications, shall be entitled to vote at all elections....[[9]]
Const. 1889 art. VI, § 1.
Thus, article VI, section 1, affirmatively sets the exclusive qualifications for voting.
*1381 The legislature could not, in light of this language, impose additional qualifications on voter eligibility. Noticeably contrasting language was used to address qualifications for office.
The qualification clauses for office provides, "No person shall be eligible to the legislature who shall not be a citizen of the United States and a qualified voter in the district for which he is chosen" (Const. art. II, § 7) and "No person, except a citizen of the United States and a qualified elector of this state, shall be eligible to hold any state office" (Const. art. III, § 25).
Unfortunately the majority does not grasp the importance of the difference in language used in these parallel settings, purblind asserting the meaning is the same. Thus, the majority violates the cardinal rule of construction which holds, "Where different language is used in the same connection in different parts of a statute, it is presumed that a different meaning was intended." State v. Roth, 78 Wash.2d 711, 715, 479 P.2d 55 (1971).
Exclusive language was employed in the voter qualification clause, evidencing the qualifications set forth therein were intentionally exclusive; however, negative language was used in the office-holding qualification clause. The difference is obvious. But the majority does not account for it.
Contemporary authorities to our constitutional ratification were well able to discern the difference between negative and exclusive language: "Where the constitution has prescribed the qualifications, the possession of which shall entitle an individual to hold office under the state, it is not within the power of the legislature to change or add to them.... A negative provision, however, as that a person not an elector shall not be appointed or elected to an office in the state, does not preclude the legislature from adding other reasonable and proper requirements." Floyd R. Mechem, A Treatise on the Law of Public Offices and Officers § 96 (1890). Case law of the time, and thereafter, agreed.
For example, the Ohio high court held in 1876 that negative phraseology in its constitutional qualifications clause did not preclude the legislature from enacting reasonable additional qualifications. State ex rel. Atty. Gen. v. Covington, 29 Ohio St. 102, 117-18 (1876). The negatively worded language there was the same as ours. Id. at 117 ("No person shall be elected or appointed to any office in this state, unless he possesses the qualifications of an elector.") (quoting Ohio Const. art. XV, § 4). The Ohio court there upheld a statute requiring all officeholders must be residents for three years and be able to read and write. Id. at 117. Holding the negatively worded constitutional language was not offended, the court wrote:
It is apparent that this statute is not in conflict with the terms of this constitutional provision. It does not authorize the appointment of a person who is not an elector. The express provision of the constitution is, that a person not an elector shall not be elected or appointed to any office in this state. Now, unless the clear implication is that every person who has the qualifications of an elector shall be eligible to any office in this state, there is no conflict between the statute and the constitution. I do not believe that such implication arises. .... If the framers of the constitution had intended to take away from the legislature the power to name disqualifications for office, other than the one named in the constitution, it would not have been left to the very doubtful implication which is claimed from the provision under consideration. The power under the general grant being ample and certain, a statute should not be declared void because in conflict with an alleged implication, unless such implication be clear and indubitable.
Id. at 117-18.
In 1883 the South Carolina Supreme Court followed that same distinction. State v. *1382 Williams, 20 S.C. 12, 17 (1883). After our constitution was adopted, several more courts elaborated. For example, the North Carolina high court interpreted a constitutional clause which stated, "Every voter in North Carolina, except as in this article disqualified, shall be eligible to office" to be exclusive while observing that if the constitution were worded negatively, as is Washington's, then the legislature could add qualifications. State ex rel. Spruill v. Bateman, 162 N.C. 588, 591, 77 S.E. 768 (1913) (quoting N.C. Const. art. VII, § 7). The North Carolina Supreme Court therein stated the obvious: "It is true that where a Constitution provides that `no person shall be elected or appointed to any office unless he possesses the qualifications of an elector,' the Legislature can prescribe additional qualifications." Id. at 591, 77 S.E. 768.
The New Mexico Supreme court followed suit soon thereafter in Gibbany v. Ford, 29 N.M. 621, 225 P. 577, 578 (1924) (interpreting N.M. Const. art. VII, § 2: "Every citizen of the United States who is a legal resident of the state and is a qualified elector therein, shall be qualified to hold any public office in the state except as otherwise provided in this Constitution."). The court went to the heart of the issue and held that the legislature cannot add qualifications "because the constitutional provision is not a negative one, providing that no person shall be eligible to hold an office unless he possess certain qualifications, as is often the case in other states, but is a positive provision, giving the right to every person possessing the qualifications therein set forth to hold office." Id. 225 P. at 578.
Drafters of our constitution had every reason to be well aware of the difference between negative and exclusive phraseology. In 1889, when our constitution was drafted, several states had recently included exclusive qualifications for holding office in their constitutions. For example, North Carolina's second constitution, written in 1868, included a provision clearly stating that citizenship and voter status shall be the sole requirements for public office and that the legislature cannot add qualifications thereto. N.C. Const. art. VI, § 6 ("Every qualified voter in North Carolina who is 21 years of age, except as in this Constitution disqualified, shall be eligible for election by the people to office.") North Carolina inserted this language because of fears the legislature might enact laws to deprive a certain group access to office.[10] Several other state constitutions used similarly exclusive language.[11] Ours did not but our majority rewrites it under the guise of construing it.
The majority makes much of the framers' debate on possibly inserting mandatory term limits into the constitution. Majority at 1373-1374. The fact is the convention debated, but decided not to make term limits a constitutional mandate. The resulting constitution suggests the framers thought enough of term limits to discuss them while simultaneously rejecting the proposition that the legislature cannot impose reasonable term limits in the future. The resulting negative language in the qualifications clause perhaps represents a compromise on the term limits debate to leave the legislature free to impose and remove term limits as it *1383 saw fit by simple legislative enactment. If the drafters intended to restrain legislative power from imposing additional disqualifications, such as term limits, they could have easily proposed an exclusive qualification provision, yet they did not.

Other History
The Washington legislature has always acted consistent with the view that the negatively worded qualification clauses mean what they say and do not restrain the legislature from adding reasonable qualifications.[12] The majority acknowledges one example, the statutory requirement that the attorney general be a qualified practitioner before the supreme court. Majority at 1376 (citing RCW 43.10.010).
The attorney general is a constitutional executive officer. Const. art. III, § 1. The constitution imposes no qualifications on the attorney general other than those minimums found in the provision setting the minimum for all state officers, the same clause at issue today. Const. art. III, § 25. The constitution sets no requirement that the attorney general be qualified to practice before this or any court. Yet the legislature imposed the qualification as an additional minimum requirement for holding that office. The additional qualification legislatively imposed on the attorney general is irreconcilable with the majority's position that the legislature may never add to the constitutional minimum qualifications. Yet the majority gives its stamp of approval to this additional qualification and that statute remains in force today. See RCW 43.10.010. The only explanation offered for this incongruous result by the majority is the fact that the territorial legislature enacted that law one year prior to the constitutional convention. Majority at 1376. However by the majority's logic, the newly adopted constitution would have nullified this law, like any other prior inconsistent statute as Const. art. XXVII, § 2, only purports to retain territorial laws "which are not repugnant to this Constitution...."
A more probable view is the legislature passed a qualification law contemporaneously with the drafting of the constitution because it viewed the addition of legislative qualifications constitutionally consistent. Cf. Malyon v. Pierce County, 131 Wash.2d 779, 799, 935 P.2d 1272 (1997) (fact that religious societies provided most social services to the public at time of constitutional convention indicates the state establishment clause is not offended by use of volunteer chaplains).[13]
The practice of legislative additions to qualifications for office has continued without abatement. For example, the code of 1891 reveals a statute declaring various officeholders ineligible to hold the constitutional office of justice of the peace. Hill's Gen.Stat. (1891) vol. I, § 303 entitled "Who eligible to office of justice" ("[N]or shall any sheriff, coroner, or clerk of the superior court be eligible to or hold such office."). See also RCW 29.65.010(4) (disqualifying from any elected office anyone who bribes a voter or election judge during his campaign); RCW 29.15.050 (to be eligible for public office, candidates must file fee of one-percent of annual salary of office sought). Such legislative acts are clearly additional qualifications inconsistent with the majority's position. Or more accurately, the majority's position is inconsistent with long-standing practice. See Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. Puget Sound L.Rev. 491, 521 *1384 (1984) (early legislative construction of a constitutional provision "should be given great weight, especially if it extended over a long period of time.").
The majority, however, ignores the text and history, instead focusing on the dicta appearing in a single case, In re Bartz, 47 Wash.2d 161, 287 P.2d 119 (1955). Majority at 1374. In Bartz the legislature enacted a statute providing no one is eligible to hold the office of justice of the peace except an attorney. Laws of 1951, ch. 156, § 2. Bartz upheld the legislatively added qualification on the ground the legislature had always set such qualifications and because judicial officers were not subject to the executive or legislative qualifications clauses. However, then the court continued to enunciate a seemingly contradictory position that the legislature cannot add to qualifications for constitutional offices. Young v. Konz, 91 Wash.2d 532, 542, 588 P.2d 1360 (1979) characterized the Bartz holding as one upholding "the power of the legislature to prescribe qualifications for judges of justice courts." That which is beyond, or not necessary to, this holding is dicta.[14] Dicta is not controlling authority and need not be followed. State v. Potter, 68 Wash.App. 134, 150 n. 7, 842 P.2d 481 (1992).
By text, precedent, and practice, negatively phrased qualification clauses do not restrict legislative imposition of additional reasonable qualifications for office.

Other Jurisdictions
While the majority strings citations to support its position of exclusivity (Majority at 1375-1376), in truth courts have not been uniform in their treatment of term limits. In fact, legislative term limits are currently the law in some 20 American states whereas only one court has stricken term limits as a violation of a state qualification clause. Such is a far different picture from that which the majority paints.
First, we must distinguish the United States Supreme Court case which struck down state imposed term limits for federal congressional officers. U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995). Thornton is a case about federalism and, as such, has very limited applicability to our state law inquiry. Thornton involved an Arkansas state constitutional amendment which purported to impose term limits on Arkansas' congressional delegation. The divided 5-4 Thornton court held neither Arkansas nor any other state could impose term limits on federal officers, however, not because of the language of the federal qualifications clauses but because the states lack power to alter the qualifications for any federal offices for reasons of federal supremacy.[15] The Thornton majority reasoned allowing the states to alter federal qualifications would disrupt the uniform national government.[16] The majority also based its holding on the particular intent of the national framers and the peculiar attendant *1385 constitutional history.[17] The Thornton dissent argued that the original vision of federalism left the states the power to set the qualifications of their federal representatives. Id. at 845, 115 S.Ct. at 1875 (Thomas, J., dissenting, joined by Rehnquist, C.J., and O'Connor and Scalia, JJ.). Thornton has no bearing on term limits for state officers and leaves state term limits untouched.
Turning to term limits imposed upon state officers and judicial treatment thereof, it is interesting to note many states have historically imposed term limits on their governors without constitutional invalidation.[18] The controversy over term limits gathered force, however, after the states began to impose limits on legislators in 1990. Currently, 14 states have imposed term limits on state officers by state constitutional amendment, although the relevant constitutions generally allow constitutional amendment directly by the people through initiative without legislative approval. Karen Hansen, Living Within the Limits, in State Legislatures 15 (June 1997).[19] No court has stricken term limits in these states[20] and, where addressed, term limits have been upheld as valid expressions of popular will.[21]
In addition to the 14 states just mentioned, six states, including Washington, have imposed term limits by direct legislative enactment. Idaho Code § 34-907; Mass. Gen. Laws ch. 53, § 48; Me.Rev.Stat. Ann. tit. 21-A, § 553-54; Utah Code Ann. § 20A-10-201; Wyo. Stat. Ann. § 22-5-103.[22] Of those six states, court challenges have been made in only two, Massachusetts and Maine, besides Washington.[23] The Massachusetts court struck down term limits while the Maine court upheld them. Thus, there is one case on each side of the debate, although, between the two, the Massachusetts case is of limited persuasiveness because of the language of its state constitution whereas the Maine case is directly on point.
Massachusetts struck down the popularly enacted term limits on the ground the people lack the power to alter qualifications for state office. League of Women Voters v. Secretary of Com., 425 Mass. 424, 681 N.E.2d 842 (1997). However, the peculiar language of the Massachusetts constitution is exclusive in form. Indeed, the Massachusetts high court relied in part on article 9 of its state constitution in reaching its decision. Id. 681 N.E.2d at 844. That constitutional provision declares constitutional qualifications to be exclusive: "all the inhabitants of this Commonwealth, having such qualifications as they shall establish by their frame of government,[[24]] have an equal right ... to be elected, for public employments." Id. at 844 n. 5 (quoting article 9 of the Massachusetts Declaration of Rights).
More on point is the Maine case where the relevant constitutional language is materially *1386 similar to Washington's. League of Women Voters v. Secretary of State, 683 A.2d 769 (1996). There, as here, the people of Maine enacted term limits by popular initiative. The initiative was challenged on the ground it conflicted with Maine's negative constitutional qualifications clause language which, like Washington's, provides "No person shall be a member of the House of Representatives" (id. at 773 n. 8 (quoting Me. Const. art. IV, pt. 1, § 4)) "unless [the person] shall, at the commencement of the period for which [the person] is elected, have been 5 years a citizen of the United States, have arrived at the age of 21 years...." (Me. Const. art. IV, pt. 1, § 4). The Maine Supreme Court concluded the negatively worded constitutional language did not restrain the people from legislatively imposing term limits and, in the absence of any such restraint, the people were free to enact term limits. Id. at 773 n. 8. The Maine Supreme Court therefore upheld the term limits. Id. at 773 ("We therefore answer Question One by concluding that limits on the number of consecutive terms that may be served by Maine legislators may be enacted by legislation."). The Maine case cannot be distinguished from our own.

Are Term Limits Consistent with the Spirit of Our Constitution?
While dispositively concluding the letter of the constitution does not prohibit term limits by initiative, I further posit neither is the spirit of our constitution offended by same. The tenor of various clauses such as Const. art. I, § 1 ("All political power is inherent in the people, and governments derive their just powers from the consent of the governed...."), the free elections clause (Const art. I, § 19) ("All Elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.") and the overall structure of our constitutional republic support this view.
If anything the very nature of our constitution is to limit government. To strike term limits because they interfere with our constitutional system is indeed anomalous as term limits are overtly a restraint on career politicians and serve as an indirect further check on the legislative branch.[25]
By design, Washington's legislature has always been a citizen legislature comprised of people wedded to other professions who gather but a short time annually or biannually about the people's business. As such these legislators, more than most, are "called for the most part from pursuits of a private nature, continued in appointment for a short time," and then return to private life. The Federalist No. 62, at 419 (James Madison) (Jacob E. Cooke ed., 1961). Term limits, which ensure our legislators remain citizen legislators,[26] not career state employees, are generally consistent with this constitutional framework and specifically consistent with our citizen's historically populist mistrust of the legislature.[27] That this legacy remains in the minds of our citizens perhaps explains the popular adoption of the act before us today.
Additionally, there is a claim that such term limits infringe on the right to free elections. Such a claim was rejected outright with respect to California's absolute prohibition in Bates v. Jones, 131 F.3d 843, 846-47 (9th Cir.1997) ("[T]erm limits on state officeholders is a neutral candidacy qualification, such as age or residence, which the State certainly has the right to impose."). The free election clause is intended in part to ensure "the door of this part of the Federal Government, is open to merit of every description, whether native or adoptive, whether young or old, and without regard to poverty *1387 or wealth, or to any particular profession of religious faith." The Federalist No. 52, at 355 (James Madison) (Jacob E. Cooke, ed.1961). Term limits are intended precisely to minimize the power of incumbency and open the door to outsiders who might seek office. The logic of such limits was recently recognized by the United States Supreme Court: "[S]uch limits may provide for the infusion of fresh ideas and new perspectives, and may decrease the likelihood that representatives will lose touch with their constituents." U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 837, 115 S.Ct. 1842, 1871, 131 L.Ed.2d 881 (1995). Indeed, these term limits were enacted upon the realization that Washington's "[e]ntrenched incumbents have an inordinate advantage in elections because of their control of campaign finance laws and gerrymandering of electoral districts; [and that] [e]ntrenched incumbency has discouraged qualified citizens from seeking public office." Laws of 1993, ch. 1, § 1(3), (4) (Initiative Measure No. 573). Term limits are arguably necessary to break the incumbency cycle.

Constitutional Reasonableness of These Term Limits
Concluding term limits are not prohibited by the qualifications clauses or by our constitutional framework, we might further inquire if they are reasonable. Indeed, to be valid, every law must be reasonable in the constitutional sense. Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894). Such applies with equal force to legislatively imposed qualifications for office and ballot access measures. Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Mechem, supra, § 66 (legislatively imposed qualifications for office must be "reasonable and proper."); In re Bartz, 47 Wash.2d 161, 168, 287 P.2d 119 (1955) (upholding legislatively imposed qualification that justices of the peace be attorneys because such is "reasonable"); State ex rel. Buttz v. Marion Circuit Court, 225 Ind. 7, 72 N.E.2d 225, 170 A.L.R. 187 (1947) ("The fact, however, that the Legislature may fix qualifications for holding public office ... does not mean that in the fixing of such qualifications ... [they must] not be arbitrary, they must be reasonable and based upon substantial grounds which are natural and inherent in the subject matter of the legislation.").
The classic three-prong test of reasonableness would ask: (1) do term limits have a valid public purpose, (2) do they use means calculated to achieve that purpose, and (3) are they unduly oppressive upon individuals? Presbytery of Seattle v. King County, 114 Wash.2d 320, 330-31, 787 P.2d 907 (1990) (citing Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894)), cert. denied, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990).
Term limits have the valid public purpose of imposing a check on elected officeholders. They are intended to promote access to office by forcing incumbents to step aside to make way for nonincumbents. See Laws of 1993, ch. 1, § 1(7) (Initiative Measure No. 573) ("The people of Washington have a compelling interest in preventing the self-perpetuating monopoly of elective office by a dynastic ruling class."). Term limits clearly promote this end. Nor are term limits unduly oppressive upon the individual incumbents who are "limited out" since it is a privilege to serve through an office of public trust, not a private right which one can conceivably be denied by an unduly oppressive government. Plaintiffs' First and Fourteenth Amendments rights are not violated by term limits. Bates v. Jones, 131 F.3d 843, 846-47 (9th Cir.1997).
Nor are Washington's term limits absolute. Compare Bates v. Jones (upholding California lifetime term limits ban against constitutional challenge). On the contrary, they merely force incumbents to step aside for a short period. A legislator may serve six years in the state house, eight years in the senate and then after a six year hiatus can serve another straight eight years in the senate. RCW 44.04.015. While the enactment may practically bar one from succession to office, technically, if the incumbent is sufficiently popular, he may still win by write-in. The fact that a law uses restrictive rather than wholly prohibitory language also suggests the law is "reasonable." Ralph v. City of Wenatchee, 34 Wash.2d 638, 644, 209 *1388 P.2d 270 (1949). That these limits are reasonable the majority does not dispute.
Today, six votes on this court are the undoing of the 1,119,985 votes that Washingtonians cast at the polls in favor of term limits. In the final analysis term limits must be upheld because the constitution does not prohibit it. I therefore dissent.
ALEXANDER, J., concurs.
NOTES
[1] Aside from legislative offices, Initiative 573 affects only the governor and the lieutenant governor, and not the judiciary, attorney general, secretary of state, auditor, treasurer, superintendent of public instruction (SPI), land commissioner, or insurance commissioner. Ironically, in AGO 61-62, No. 173, at 1 (1962), the attorney general concluded the Legislature did not have the authority to establish additional qualifications for the SPI beyond those set forth in article III, section 25:

"[t]he legislature does not have the authority to establish qualifications for the office of the state superintendent of public instruction in addition to those found in Article III, § 25, Amendment 31, of the Washington State Constitution."
[2] Prior to the enactment of Initiative 573, significant turnover in the Washington Legislature occurred without the mandate of this law. In the 1992 election itself, the Washington House of Representatives had 38 newly elected members, or 39 percent, and the Senate had 16 newly elected members, or 33 percent. The House of Representatives had 42 new members after the 1994 election. See 1993-94 Washington Legislative Manual at 469-78, 529-44; 1995-96 Washington Legislative Manual at 453-68.

It is also noteworthy the voters in 1996 rejected Initiative 670 which would have required a notation on the ballot affixed to the name of any candidate who opposed term limits.
[3] The use of this language regarding declarations of candidacy, nomination papers, and names on the ballot also means the secretary, who is charged with preparing the official Voters' Pamphlet, may not include candidates subject to Initiative 573 in the official Voters' Pamphlet. RCW 29.80.010; RCW 29.04.180.
[4] Because section 7(2) of Initiative 573 excludes service before November 3, 1992 in any eligibility calculation, 1998 will be the first year in which some members of the State House of Representatives will be subject to Initiative 573. No state senator will be affected until the year 2000. Since a new governor and lieutenant governor were elected in 1996, 2004 is the first year in which there may be an incumbent in either of those offices subject to the provisions of Initiative 573. See RCW 29.15.240(2).
[5] Cf. Representative Linda Smith's successful 1994 Congressional campaign, in which she secured the Republican Party nomination by a write-in campaign, but her name was placed on the general election ballot and her statement and photograph appeared in the Voters' Pamphlet.
[6] U.S. CONST. art. I, § 2, cl. 2 provides:

No Person shall be a Representative who shall not have attained to the age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.
[7] See note 9, infra.
[8] The original term limit qualification applicable to the state treasurer was deleted by Amendment 31 in 1956. See Laws of 1955, 34th Leg., S.J.R. No. 6, at 1861, approved November 6, 1956.
[9] WASH. CONST. art. XI, § 7, was repealed by Amendment 22 in 1948. See Laws of 1947, 30th Leg., H.R.J. No. 4 at 1385, approved November 2, 1948.
[10] Amicus PLF argues disqualifications from office for felons, minimum age requirements, durational residency requirements, and anti-nepotism requirements are all examples of valid restrictions on candidacies. We express no view on such restrictions, but note the examples cited by PLF do not support a disposition of this case different from the one we announce today. The disqualification for ex-felons is a constitutional directive in Washington, WASH. CONST. art. VI, § 3 (amend.83), and qualifications such as minimum age or durational residency requirements were debated as constitutional qualifications for state officers at the 1889 convention. Journal at 589-90. These qualifications do not address the question of whether the state officer qualifications sections in the Washington Constitution are exclusive.

Furthermore, the cases cited by PLF from other jurisdictions are not in conflict with our disposition of this case. See, e.g., Stiles v. Blunt, 912 F.2d 260 (8th Cir.1990), cert. denied, 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 241 (1991) (upholding a Missouri constitutional age requirement for the constitutional office of state representative); Zielasko v. Ohio, 873 F.2d 957 (6th Cir.1989) (upholding an Ohio constitutional age requirement for state judicial office). See also Sununu v. Stark, 383 F.Supp. 1287 (D.N.H. 1974), aff'd, 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435 (1975); Chimento v. Stark, 353 F.Supp. 1211 (D.N.H.), aff'd, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973) (upholding New Hampshire's constitutionally imposed residency requirement for constitutional offices of state senator and governor, respectively).
The antinepotism requirement cited by PLF is inapposite. It is a Kentucky statutory requirement imposed on the statutorily created Board of Education by the Kentucky General Assembly which has oversight responsibility for education under the Kentucky Constitution. See Chapman v. Gorman, 839 S.W.2d 232, 233-37 (Ky.1992); KY. CONST. § 183; KRS § 160.160.
[11] We have often stated the initiative process, as a means by which the people can exercise directly the legislative authority to enact bills and laws, is limited in scope to subject matter which is legislative in nature. Ruano v. Spellman, 81 Wash.2d 820, 823, 505 P.2d 447 (1973); Seattle Bldg. & Constr. Trades Council v. City of Seattle, 94 Wash.2d 740, 748, 620 P.2d 82 (1980) (declaring initiative attempting to achieve something not within its power invalid); see also Leonard v. City of Bothell, 87 Wash.2d 847, 849-50, 557 P.2d 1306 (1976) (noting referendum elections are limited in scope to acts by a governmental body which are legislative in nature). Thus, the initiative power may not be used to amend the Constitution. Ford v. Logan, 79 Wash.2d 147, 156, 483 P.2d 1247 (1971); see also Philadelphia II v. Gregoire, 128 Wash.2d 707, 718, 911 P.2d 389, cert. denied, ___ U.S. ___, 117 S.Ct. 167, 136 L.Ed.2d 109 (1996). See also Jefferey T. Even, Direct Democracy in Washington: A Discourse on the Peoples' Powers of Initiative and Referendum, 32 GONZ. L. REV. 247, 270 (1996-97) (the Washington initiative process is limited to legislative acts and does not include constitutional amendments).
[12] In light of our disposition of the issue of improper additional qualifications to constitutional offices in violation of the Washington Constitution, we do not address the other arguments by the parties such as the impact of the Law on rights of expression, suffrage, free association, or equal treatment. See Leonard v. City of Spokane, 127 Wash.2d 194, 202, 897 P.2d 358 (1995).
[1] See, e.g., 1 Joseph Story, Commentaries on the Constitution of the United States § 451 (Melville M. Bigelow ed., 5th ed. 1891):

Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common-sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss.
[2] Such an exclusive reading of constitution article II, section 7 and article III, section 25, would also require an exclusive reading of article IV, section 17 ("No person shall be eligible to the office of judge of the supreme court, or judge of a superior court, unless he shall have been admitted to practice in the courts of record of this state, or of the Territory of Washington.") thus placing its exclusive qualifications in direct conflict with article IV, section 31(5) (supreme court may remove or suspend judge or justice "and that person is ineligible for judicial office until eligibility is reinstated by the supreme court.").
[3] One commentator has referred to the construction preferred by the majority as reading "something that is not there." Lloyd Cutler, The Constitutionality of State-Imposed Term Limits for Federal Office in The Politics and Law of Term Limits 113 (Edward H. Crane & Roger Pilon eds., 1994) (reading the qualifications clauses to be exclusive "suggests something that is not there. In reality, of course, those clauses do not list qualificationsmuch less the qualifications. They are worded entirely in the negative. They list some disqualifications. They say that `no person shall be' eligible to serve unless of at least a certain age, residency, and duration of citizenship.").
[4] The majority asserts that laws are presumed constitutional until proven unconstitutional "beyond a reasonable doubt." Majority at 1370. I question whether this standard is applicable to the legal question before us. Indeed, "beyond a reasonable doubt" is generally reserved for the guilt of an accused and is used because the accused is deemed innocent until proven the opposite. However, there is no sensible reason to carry over the same factual standard to the constitutionality of legislation. Whether legislative power has been abused should be a legal question reviewed de novo as any other legal question. Compare Brown v. Multnomah County Dist. Court, 280 Or. 95, 570 P.2d 52, 56 n. 6 (1977). However, were we to measure the majority by its own yardstick, it would most surely fall short, as there are many reasons to doubt the correctness of its view.
[5] For example, Justice Theodore L. Stiles, elected to the Washington Supreme Court on the same day the constitution was popularly ratified, played a leading role in the constitutional convention and was reputed as a scholar and constitutional authority. Charles H. Sheldon, The Washington High Bench, A Biographical History of the State Supreme Court, 1889-1991, at 327 (1992).
[6] Perhaps we should refer to them as "disqualification clauses" instead as they really set conditions that disqualify one from office.
[7] Westerman v. Cary, 125 Wash.2d 277, 288, 892 P.2d 1067 (1994) ("We will presume the language [of our constitution] carries its ordinary and popular meaning, unless shown otherwise.").
[8] "Possible or even probable meanings, when one is plainly declared in the instrument itself, the courts are not at liberty to search for elsewhere." Thomas M. Cooley, A Treatise on the Constitutional Limitations 70 (6th ed. 1890).
[9] The same provision, article VI, section 1, currently reads:

Qualifications of Electors. All persons of the age of eighteen years or over who are citizens of the United States and who have lived in the state, county, and precinct thirty days immediately preceding the election at which they offer to vote, except those disqualified by Article VI, section 3 of this Constitution, shall be entitled to vote at all elections.
Constitution article VI, section 3, currently provides:
Who Disqualified. All persons convicted of infamous crime unless restored to their civil rights and all persons while they are judicially declared mentally incompetent are excluded from the elective franchise.
[10] In State ex rel. Spruill v. Bateman, 162 N.C. 588, 592, 77 S.E. 768 (1913) the court explained:

The purpose of this peculiar phraseology in the North Carolina Constitution is well known by every one. A newly emancipated element had been admitted to suffrage, and it was rightly anticipated that at some future day there might be a majority in the General Assembly unfavorable to their holding office, so the provision was made that "every voter," except as disqualified by the Constitution, should be eligible "to office."
[11] Conn. Const. art VI, § 10 ("Every elector who has attained the age of eighteen years shall be eligible to any office in the state ... except in cases provided for in this constitution."); Minn. Const. art. VII, § 6 ("Every person who by the provisions of this article is entitled to vote at any election and is 21 years of age is eligible for any office elective by the people in the district wherein he has resided 30 days previous to the election, except as otherwise provided in this constitution...."); N.M. Const. art. VII, § 2 ("Every citizen of the United States who is a legal resident of the state and is a qualified elector therein, shall be qualified to hold any elective public office except as otherwise provided in this constitution."); S.C. Const. art. XVII, § 1A ("Every qualified elector is eligible to any office to be voted for, unless disqualified by age, as prescribed in this Constitution.").
[12] At the time our constitution was ratified, legislatures routinely set additional qualifications. See, e.g., Thomas M. Cooley, supra, at 748 n. 1 (discussing in the abstract the rule that one must be a qualified voter to hold office Cooley concluded, "The question is not very important, as State constitutions or statutes generally lay down that rule, in some cases adding further requirements.") (emphasis added).
[13] See also In re Bartz, 47 Wash.2d 161, 168, 287 P.2d 119 (1955) ("The legislature has consistently acted on the assumption that it had this power [to establish qualifications for justices of the peace], both before and after the adoption of the constitution.... `Where a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention.' 1 Cooley's Constitutional Limitations (8th ed.) 144 (1927).").
[14] Bartz's statement that qualifications are exclusive is dicta in light of the court's ultimate holding that the legislature appropriately prescribed reasonable qualifications for constitutional judicial officers. In light of that holding, any statement that the legislature may not impose qualifications on other constitutional officers is unnecessary. See Pedersen v. Klinkert, 56 Wash.2d 313, 317, 320, 352 P.2d 1025 (1960) (dicta is language not necessary to the decision in a particular case).
[15] U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 803, 115 S.Ct. 1842, 1855, 131 L.Ed.2d 881 (1995) ("each Member of Congress is `an officer of the union, deriving his powers and qualifications from the constitution, and neither created by, dependent upon, nor controllable by, the states.... Those officers owe their existence and functions to the united voice of the whole, not of a portion, of the people.' Representatives and Senators are as much officers of the entire union as is the President. States thus `have just as much right, and no more, to prescribe new qualifications for a representative, as they have for a president ....'") (quoting also 1 Joseph Story, Commentaries on the Constitution of the United States § 627 (3d ed. 1858)).
[16] U.S. Term Limits, Inc., 514 U.S. at 783, 115 S.Ct. at 1845 ("Allowing individual States to adopt their own qualifications for congressional service would be inconsistent with the Framers' vision of a uniform National Legislature representing the people of the United States."). Cf. Foster v. Love, ___ U.S. ___, 118 S.Ct. 464, ___ L.Ed.2d ___ (1997) (unanimous court struck down Louisiana state statute which provided for federal congressional elections to be held in Louisiana in October because the states cannot alter the uniformity of federal elections).
[17] U.S. Term Limits, Inc., 514 U.S. at 800-01, 115 S.Ct. at 1853-54 (after reviewing the constitutional history the majority "conclude[d] that the Framers intended the Constitution to be the exclusive source of qualifications for Members of Congress.").
[18] See Miyazawa v. City of Cincinnati, 825 F.Supp. 816, 821 (S.D.Ohio 1993) (noting that over 20 states have term limits for governors), aff'd, 45 F.3d 126 (6th Cir.1995).
[19] Those states include Arizona, Arkansas, California, Colorado, Florida, Louisiana, Michigan, Missouri, Montana, Nevada, Ohio, Oklahoma, Oregon, and South Dakota.
[20] The Ninth Circuit recently upheld California's term limits law, which imposes a specific lifetime term limits ban on state legislators and certain state officers, as consistent with federal constitutional requirements. Bates v. Jones, 131 F.3d 843 (9th Cir.1997).
[21] See, e.g., U.S. Term Limits, Inc. v. Hill, 316 Ark. 251, 872 S.W.2d 349, 359-60 (1994), aff'd, 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995); Legislature of State of Cal. v. Eu, 54 Cal.3d 492, 816 P.2d 1309, 286 Cal.Rptr. 283 (1991), cert. denied, 503 U.S. 919, 112 S.Ct. 1292, 117 L.Ed.2d 516 (1992); Nevada Judges Ass'n v. Lau, 112 Nev. 51, 910 P.2d 898 (1996).
[22] In all of the six term limits were popularly imposed by initiative except in Utah where the legislature itself passed term limits.
[23] The Alaska high court ruled, by advisory opinion, that the voters would not be able to enact term limits by initiative. Alaskans for Legislative Reform v. State, 887 P.2d 960 (Alaska 1994). The voters, however, never tried.
[24] As the court noted, "The frame of government is Part II of our Constitution." League of Women Voters, 681 N.E.2d at 844.
[25] Legislature of State of Cal. v. Eu, 54 Cal.3d 492, 816 P.2d 1309, 1329, 286 Cal.Rptr. 283 (1991) ("In sum, it would be anomalous to hold that a statewide initiative measure aimed at `restor[ing] a free and democratic system of fair elections,' and `encourag[ing] qualified candidates to seek public office' (Cal. Const., art. IV, § 1.5), is invalid as an unwarranted infringement of the rights to vote and to seek public office.").
[26] See term limits law, Laws 1993, ch. 1, § 1(1) ("The people will best be served by citizen legislators who are subject to a reasonable degree of rotation in office[.]").
[27] See Lebbeus J. Knapp, The Origin of the Constitution of the State of Washington, 4 Wash. Historical Q. 227, 228, 250 (Oct.1913).