[No. 66417-0. En Banc.]
Argued June 10, 1998. Decided July 30, 1998.

CAROL BELAS, *as Kitsap County Assessor*, ET AL, *Petitioners*, v. FREDERICK C. KIGA, *as Director of the Department of Revenue, Respondent.*

914

*Russell D. Hauge, Prosecuting Attorney for Kitsap County,* and *Cassandra Noble, Deputy; Norm Maleng, Pros-*

*ecuting Attorney for King County*, and *Margaret A. Pahl, Deputy*; *Randall K. Gaylord, Prosecuting Attorney for San Juan County*; *John G. Wetle, Prosecuting Attorney for Stevens County*; *K. Garl Long, Prosecuting Attorney for Skagit County*, and *John R. Moffat, Deputy*; *Allen C. Nielson, Prosecuting Attorney for Ferry County*; *David G. Skeen, Prosecuting Attorney for Jefferson County*, and *Paul McIlrath, Deputy*; *James J. Stonier, Prosecuting Attorney for Cowlitz County*, and *Ronald S. Marshall, Deputy*; *Jeremy R. Randolph, Prosecuting Attorney for Lewis County*, and *Jeffrey G. Fancher, Deputy*; and *Gary P. Burleson, Prosecuting Attorney for Mason County*, for petitioners.

*Christine O. Gregoire, Attorney General*, and *Edward B. Mackie, Special Assistant*; and *Frederick C. Kiga*, for respondent.

*William C. Severson* on behalf of Washington Association of County Officials, amicus curiae.

GUY, J. — This is an original action brought by 10 elected county assessors challenging the constitutionality of a portion of a 1997 referendum which changed the method of assessing real property for the purpose of levying property taxes. The county assessors argue the new scheme violates the uniformity requirement of the Washington Constitution and unfairly shifts the tax burden from owners of rapidly appreciating property to owners of property which is staying more stable in value or which is depreciating in value. We agree with the assessors that the challenged provisions violate article VII of our state constitution. The apparent intent of value averaging was to accommodate

taxpayers experiencing large increases in real property market values. To accomplish this, however, value averaging shifts the tax obligation to other taxpayers not experiencing large value increases. While the goal of alleviating rapid increases in taxes is laudable, the method used is unfair and unconstitutional.

## FACTS

In 1997, the Legislature referred Referendum 47 to the people, and the voters approved the referendum. The elected county assessors of Kitsap, King, San Juan, Ferry, Jefferson, Cowlitz, Lewis, Stevens, Skagit, and Mason Counties (Assessors) challenge the constitutionality of that part of Referendum 47 which mandates a new "value averaging" formula for assessing the value of rapidly appreciating parcels of real property. The named respondent is the Director of the State Department of Revenue. The Department of Revenue has general supervision and control over the administration of the assessment of property and the tax Laws of the state.

Referendum 47 addresses taxation of real property in three ways. First, it reduces the state property tax levy for collection in 1998 by 4.7187 percent of the levy amount. Second, the 106 percent limit, RCW 84.55, was revised to generally lower the maximum levies of the various taxing districts. Third, individual increases in real property assessments are limited to 15 percent or 25 percent of the increase of market value in any given year. This third effect is the only part of Referendum 47 which is challenged, and is the one we address. The referendum refers to this limitation as "value averaging." The Assessors contend that Referendum 47's "value averaging" provisions produce a property tax scheme that violates the uniform taxation requirement of CONSTITUTION article VII, section 1 (amendment 14).

"Value averaging" is a value limitation mechanism which is designed to limit large increases in real property assessments for individual parcels of property. Real property as-

sessed values will be recalculated each year[1] and annual increases will be limited to the lesser of market value or a calculated limited value. The calculated limited value imposes an increase limit of either 15 percent over the prior year's assessed value or 25 percent of the market change of value if the change exceeds 60 percent, whichever is greater. Laws of 1997, ch. 3, § 105.[2]

The effect of this limit is that: (1) for property with a market increase of less than 15 percent, the assessed value of a parcel will be its full market value; (2) for property with a market increase of between 15 percent and 60 percent, the assessed value will increase by only 15 percent from the previous year's assessed value; and (3) for properties with a market increase of greater than 60 percent, the assessed value will increase by only 25 percent of the actual market increase. Agreed Fact 827 (Table 1). For example, in an annual appraisal county, if a $100,000 property

---

[1]Some counties reappraise property each year and other counties revalue property on a two-, three- or four-year cycle. For multiyear cyclical counties, the appraised values remain constant in the interim years when a property is outside of the revaluation area. Agreed Facts 315-18. For example, in a four-year cycle county, one-fourth of the parcels of property would be reappraised each year. Whether property is reappraised every year or not, under the value averaging formula, property is *reassessed* for purposes of levying taxes yearly. *See* Agreed Fact 327. For cyclical counties, there would be a time lag for implementing the value averaging limitation mechanism to properties located outside the current revaluation areas since the value limitation is not invoked until property is reappraised. Accordingly, when properties are reappraised in subsequent "reval" years, the value averaging mechanism would be applied to those properties. At the conclusion of a multiyear cycle, all properties would be subject to the value averaging formula and new assessed values would thereafter be calculated annually. Agreed Fact 327.

[2]Referendum 47, section 105(2) provides:

"The assessed value of property is equal to the lesser of the current appraised value or a limited value determined under this section. The limited value is equal to the greater of:

"(a) The improvement increase plus one hundred fifteen percent of the previous assessed value; or

"(b) The sum of:

"(i) The previous assessed value;

"(ii) The improvement increase; and

"(iii) Twenty-five percent of the market increase."

Laws of 1997, ch. 3, § 105(2).

increased in value by 10 percent, the new *appraised* value would be $110,000 and the new *assessed* value (upon which the tax rate would be applied to determine tax liability) would also be $110,000. If a $100,000 property increased in value by 50 percent, the new appraised value would be $150,000 but the new assessed value (upon which the tax rate would be applied) would be only $115,000. If a $100,000 property increased by 80 percent, the new appraised value would be $180,000, but the new assessed value (upon which the tax rate would be applied) would be $120,000. Agreed Fact 327.

 The Assessors sought original jurisdiction in this Court, which we granted. The parties agree that the case involves only a question of law and have submitted an 80-page Agreed Statement of Facts to which reference is made in this opinion. We have allowed the Washington Association of County Officials to file an amicus brief. The Assessors and the Association of County Officials ask us to conclude that discriminating among property owners within the same class violates the state constitutional requirement that taxes be uniform. They ask us to issue a writ mandating the Director of the Department of Revenue to disregard Referendum 47's value averaging provisions and implement the property tax laws uniformly.[3]

## ISSUE

Does the "value averaging" provision of Referendum 47 violate the constitutional requirement that taxes be uniform in one class as required by article VII, section 1 of the Washington State Constitution?

## STANDARD OF REVIEW

 The Legislature possesses a plenary power in matters of taxation except as limited by the Constitution;

---

[3]A writ of mandamus is a proper writ to compel a state officer to undertake a specific duty and can provide a vehicle to declare a law unconstitutional. *Gerberding v. Munro*, 134 Wn.2d 188, 949 P.2d 1366 (1998).

amendment 14 to the state Constitution is a limitation on the taxing power of the Legislature. *State ex rel. Mason County Logging Co. v. Wiley*, 177 Wash. 65, 73, 31 P.2d 539 (1934). A referendum or an initiative measure is an exercise of the reserved power of the people to legislate, and the people in their legislative capacity remain subject to the mandates of the Constitution. *Gerberding v. Munro*, 134 Wn.2d 188, 196, 949 P.2d 1366 (1998); Philip A. Trautman, *Initiative and Referendum in Washington: A Survey*, 49 WASH. L. REV. 55, 63, 66, 70 (1973). Constitutional provisions cannot be restricted by legislative enactments. *City of Kennewick v. Benton County*, 131 Wn.2d 768, 774, 935 P.2d 606 (1997). A statute is presumed constitutional and the parties challenging its constitutionality must demonstrate its unconstitutionality beyond a reasonable doubt. *Granite Falls Library Capital Facility Area v. Taxpayers of Granite Falls Library Capital Facility Area*, 134 Wn.2d 825, 832-33, 953 P.2d 1150 (1998); *Sator v. Department of Revenue*, 89 Wn.2d 338, 346, 572 P.2d 1094 (1977). This standard is met if argument and research establish that there is no reasonable doubt the statute violates the Constitution. *Island County v. State*, 135 Wn.2d 141, 147, 955 P.2d 377 (1998).

## DISCUSSION

Article VII of the state Constitution deals with revenue and taxation. The limitations on the assessment of property are contained in CONSTITUTION article VII, sections 1 and 2. Article VII, section 1 provides in relevant part:

> All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax . . . . The word "property" as used herein shall mean and include everything, whether tangible or intangible, subject to ownership. All real estate shall constitute one class: *Provided*, That the legislature may tax mines and mineral resources and lands devoted to reforestation by either a yield tax or an ad valorem tax . . . . Such property as the legislature may by general laws provide shall be exempt from taxation.

CONSTITUTION article VII, section 2 provides in relevant part:

Except as hereinafter provided and notwithstanding any other provision of this Constitution, the aggregate of all tax levies upon real and personal property by the state and all taxing districts now existing or hereafter created, shall not in any year exceed one per centum of the true and fair value of such property in money[.]

A brief history of article VII is helpful to understand the parties' arguments and the case law interpreting the taxing provision. The original state Constitution required uniformity in taxation of all property, real and personal, tangible and intangible. In 1930, the voters approved amendment 14 which authorized separate classifications of personal property. LAWS OF 1929, ch. 191, § 1. The purpose of the 1930 amendment was to allow the Legislature to classify different kinds of property and levy different rates on different classes. The intent was mainly to allow classes of property known as intangibles (credits, mortgages, etc.) to be taxed at rates low enough to offer no incentive for concealment or evasion. *Mason County Logging Co.*, 177 Wash. at 70. One scholar has explained the effect of amendment 14 on article VII:

> One of the major changes was to permit the classification of personal property for the purpose of taxation. Instead of requiring that assessment and levy of all property be uniform and equal, the amendment requires that "all taxes be uniform upon the same class of property." Standing alone this would have permitted classification of all types of property, but there is an important qualification. This is the requirement that "all real estate shall constitute one class . . ." with the exception that mines, mineral resources, and lands devoted to reforestation may be treated separately and made subject to a yield tax or an ad valorem tax. Thus, the overall effect of this amendment permits the legislature to exercise its discretion in classifying personal property but bars the creation of different classes of real estate except in the case of mining property and reforestation land.

Alfred Harsch, *The Washington Tax System—How It Grew*, 39 WASH. L. REV. 944, 956-57 (1965).

The requirement of article VII, section 1 that mandates that all real estate be one class and that all taxes be uniform within a class has remained the same since 1930.

Article VII, section 2 has been amended many times. Only two amendments are relevant to the case law pertaining to the present case. From 1944 through 1972, CONSTITUTION article VII, section 2 (amendment 17) provided that

> the aggregate of all tax levies upon real and personal property by the state and all taxing districts now existing or hereafter created, shall not in any year exceed forty mills on the dollar of assessed valuation, which assessed valuation shall be fifty per centum of the true and fair value of such property in money[.]

(Forty mills at 50 percent of value is 2 percent of value. *Sator*, 89 Wn.2d at 342.)

Amendment 55 was adopted in 1972 and replaced amendment 17. *Sator*, 89 Wn.2d at 342. That amendment contains the present relevant part of article VII, section 2 quoted above.

The Department of Revenue implies that the changes to article VII undercut the case law from this Court. We disagree. While the cases must be read with the knowledge that article VII, section 2 has had a number of changes, the resolution of this case depends on the requirements of article VII, section 1 which have stayed the same in relevant part since 1930.

▮ The principle underlying the property tax system is that it is an ad valorem tax, meaning the tax is based on property value. International Ass'n of Assessing Officers, *Standard on Property Tax Policy, in* ASSESSMENT JOURNAL, Sept.-Oct. 1979, at 24, 32. Where taxes are levied on a valuation (or ad valorem) basis, an assessment is indispensable. It is the first step in taxation and the foundation of what follows. 3 THOMAS M. COOLEY, THE LAW OF TAXATION § 1045, at 2116-17 (4th ed. 1924). Under CONSTITUTION article VII, section 2 (amendment 55) there is no requirement that property be assessed at 100 percent of true and fair value. The

validity of a particular tax levy is measured by whether aggregate levies exceed one percent of true and fair value and whether the taxpayer is being treated in accord with the uniformity requirement of CONSTITUTION article VII, section 1 (amendment 14). Taxpayers must be treated uniformly with other taxpayers in their class. *Sator*, 89 Wn.2d at 343.

■ Tax uniformity requires both an equal tax rate and equality in valuing the property taxed. *Covell v. City of Seattle*, 127 Wn.2d 874, 878, 905 P.2d 324 (1995); *Boeing Co. v. King County*, 75 Wn.2d 160, 165, 449 P.2d 404 (1969). In *Boeing*, 75 Wn.2d at 165, we explained that if equality is lacking in either area of the tax spectrum (i.e., either the rate of taxation or the assessment ratio), there will be a lack of uniformity in the tax burden.

An "assessment ratio" is the fractional relationship an assessed value bears to the market value of the property in question. International Association of Assessing Officers, *supra*, at 43. Referendum 47 intentionally creates a different assessment ratio for property which is appreciating at a rate in excess of 15 percent than it does for property which is not appreciating as rapidly. This difference in assessment ratio causes a lack of uniformity in the tax burden.

■ The Assessors correctly contend that under article VII, section 1, unless specifically exempted from taxation, all real estate constitutes one class which must be taxed uniformly. Delaying the full valuation assessment for property experiencing large value increases gives advantage to some taxpayers and penalizes others within the same class. Prior to Referendum 47, all owners of nonexempt real property shared the burden of taxation equally by paying a uniform rate per dollar of value. As a result of the new law, certain property owners will pay a lower amount of tax per dollar of actual value than others in their class, even if the properties are identical in all physical respects and the owners are identical in terms of income and personal characteristics. Those who will pay *less* are taxpayers who have experienced a value increase greater than 15 percent within a year.

The Assessors point out that value averaging does not change taxing district budgets; the total amount of the tax levy that must be collected remains the same. To compensate for the reduced collections from the rapidly appreciating properties, value averaging shifts the distribution of tax collection to taxpayers owning properties with smaller value increases, no value increases, or even value decreases. Therefore, the Assessors conclude that taxpayers experiencing sluggish or no property value growth, or even declining values, will be penalized by a disproportionate tax burden. We agree.

The result of value averaging will be that overall levy rates would have to increase to avoid the revenue loss which would be caused by the nonrecognition of the increase in market value of those properties which are rapidly appreciating. The effects in a number of counties would be that the owners of more modest property would experience increases in their taxes to offset the decreases of those owners who would benefit by the application of value averaging. Several examples contained in the Agreed Facts illustrate this effect:

- In Jefferson County, the properties experiencing the largest increases in value have been waterfront and water view property along the Hood Canal and the Quimper Peninsula, some doubling in value in four years. Other communities have experienced only slight property value increase, if any. These are the mostly timber-dependent communities that have experienced an economic downturn or lower income retirement areas. Under Referendum 47, such communities will be taxed at higher levy rates due to a lower overall tax base for county-wide taxing districts and the state levy. Agreed Fact 503.

- In Kitsap County, waterfront properties have been subject to dramatic increases in value during periods of inflation whereas upland properties, as well as higher density urban areas and pockets of affordable housing,

have tended to have more stable values. The Kitsap County Assessor has examined the operation of Referendum 47's value averaging by applying it to regional figures for the past six years using actual market value data. The examination showed that in some areas, such as Bainbridge Island, more property owners would benefit from the operation of Referendum 47 than would owners in other areas such as Bremerton. This is because historically more Bainbridge Island properties have increased at a high rate. Within regions, individual properties would benefit from value averaging, while others would not, since overall levy rates would have to be increased to avoid revenue loss. The study submitted shows that if Referendum 47 had been in effect from 1991 to 1996, Bremerton taxpayers would have paid taxes on 100 percent of market value each of those six years, while Bainbridge Island taxpayers would have paid taxes on 100 percent of market value only two of those years. Agreed Fact 505.

- In Lewis County, the Assessor projects that Referendum 47's value averaging would have a serious impact on 70 percent of the parcels which are not experiencing an increase that would have limited their assessed value. The Assessor has explained that these are the properties which are typically owned by lower income families and senior citizens with limited incomes and resources. The other 30 percent of real property parcels will have their assessed values limited by value averaging; these are generally the higher priced properties. In Lewis County, the owners of the more desirable homes will pay less tax. Levy rates will increase for all owners in each levy area and some owners will be taxed on a lower assessed value (a portion of market value) than others. Agreed Fact 506.

- In Mason County, much of the property value increase is attributable to waterfront properties. Referendum 47's value averaging would affect these properties by

limiting the value on waterfront properties which increased more than 15 percent in a valuation period. The total amount of taxes that must be collected for the various taxing districts will not be reduced by value averaging. Consequently, a tax burden lifted from the high value increase properties will be compensated by increased tax payments from other properties. Agreed Fact 507.

- In San Juan County, had Referendum 47 been in effect during the last 10 years, the majority of waterfront and marine view property would have qualified for preferential treatment. Most inland nonview property would not. Property that does not qualify for a limited valuation would be taxed at full market value on the basis of ratios that compensate for the limited values on other properties. Agreed Fact 508.

- In Skagit County, value averaging's reductions benefiting high appreciating residential properties would increase the tax obligation of property owners involved in production agriculture. Agreed Fact 509.

- Stevens County has experienced rapid growth in highly valued properties while lower valued homes did not experience such growth and will not benefit from value averaging. Agreed Fact 510.

- Participants in the senior citizen/disabled person property tax exemption program have their assessed values frozen in accord with state law. These frozen values will not benefit from value averaging and will be part of the properties which experience levy rates which compensate for Referendum 47's limited valuation to be used for appreciating properties. Agreed Fact 514. Hence, the tax rates for retired and disabled low-income homeowners will increase due to value averaging.

Amicus, the Washington Association of County Officials, agrees with the Assessors that property tax uniformity

requires equal assessments and equal tax rates and that the cap on assessed value, created by the value averaging provision, violates this constitutional requirement. The Association agrees that the effect of the new assessment scheme will be to shift the tax burden from those owners with rapidly appreciating property to those whose property is not rapidly appreciating. The Association points out that under Referendum 47, a $100,000 parcel of property which appreciates 10 percent will be both appraised and assessed at its new fair market value of $110,000 but that a $100,000 parcel of property which appreciates 50 percent will be appraised at $150,000 but assessed at only $115,000. This will result in the second parcel paying tax on only 77 percent of its appraised value while the less rapidly appreciating parcel will pay tax on 100 percent of its value.

█ █ We conclude that value averaging creates different assessment ratios for real property which, under article VII, section 1, is one class of property. This scheme therefore violates the uniformity requirement of our Constitution.

The International Association of Assessing Officers has produced a "Standard on Property Tax Policy," which includes the following standard on valuation increase limits:

> Limits that constrain changes in assessed or appraised value of property may appear to provide control, but actually distort the distribution of the property tax, destroying property tax equity and increasing public confusion and administrative complexity. Owners whose properties are increasing in value more rapidly than the permitted rate of increase . . . receive a windfall at the expense of those whose properties are decreasing in value or are increasing at lower rates. In effect, valuation increase limits result in lower effective property tax rates for owners of desirable property and higher effective property tax rates for owners of undesirable property. Legislators and the public should be made aware of these inequities and be actively discouraged from pursuing such limitations. Any other control is preferable.

International Ass'n of Assessing Officers, *supra*, std. 5.4.3, at 41. Agreed Fact 516.

In 1995, the Attorney General issued an opinion (AGO) concerning the requirements of article VII as it applies to property tax. 5 Op. Att'y Gen. 1 (1995) (AGO). Attorney general opinions are not controlling, but they are entitled to great weight. *E.g., Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council*, 129 Wn.2d 787, 803, 920 P.2d 581 (1996); *Elovich v. Nationwide Ins. Co.*, 104 Wn.2d 543, 550, 707 P.2d 1319 (1985).

The 1995 AGO addressed the constitutionality of the type of tax proposal which involves assessing property based on a percentage of the increase in market value. An example the opinion used was a revaluation method which limits the increase in assessed value to 25 percent of the increase in fair market value—a formula essentially the same as that used in section 105 of Referendum 47. The AGO noted that under the percentage method, the greater the increase in market value the less the increase is reflected in the assessed valuation. The result is that property is assessed at different levels. 5 Op. Att'y Gen. 12 (1995). The opinion concluded:

> In our view a method that results in assessing property at different levels violates the first requirement of uniformity [of assessment] discussed above. There is no requirement that property be assessed at fair market value, but to meet the uniformity requirement of Amendment 14, property must be assessed at the same level if expressed as a fraction of fair market value. The Supreme Court reached this conclusion in *State ex rel. Barlow v. Kinnear*, 70 Wn.2d 482, 423 P.2d 937 (1967) . . . .
>
> . . . .
>
> . . . The percentage method . . . tend[s] to favor property with greater increases in value. The greater the increase in market value, the less it is reflected in the assessed value. Such property is assessed at a lower level than property whose value does not increase as much. We believe this violates the uniformity requirement.

5 Op. Att'y Gen. 12-13 (1995).

The special attorney general representing the Department of Revenue in this case argues that AGOs are not controlling and that this AGO is irrelevant because it did not consider whether value averaging is an "exemption" from taxation. We note the AGO, in a footnote, does recognize that exemptions are exceptions to the uniformity requirement, but the opinion nonetheless concluded that formulas, like value averaging, violate article VII. 5 Op. Att'y Gen. 20 n.2 (1995).

We conclude the Assessors have shown beyond a reasonable doubt that the value averaging formula created by Referendum 47 violates the uniformity clause of article VII, section 1 of our state Constitution.

The Department of Revenue makes three basic arguments in its attempt to convince this Court that, in spite of the new law's apparent violation of the rule of uniformity, we should not declare it unconstitutional. The Department argues: that value averaging is an "exemption" from taxation and hence does not have to be uniform; that this Court by allowing cyclical reevaluation of property has not required strict uniformity in taxation of real property; and that there is no real difference between the mandate of equal protection and the requirement of uniformity of taxation and that Referendum 47 does not violate equal protection.

## Tax Exemption

The Department of Revenue first argues that value averaging is valid under the constitutional power to grant tax "exemptions," and that the Legislature has broad authorization to exempt property or "property value" from taxation. It argues that Referendum 47 is a general law providing for an exemption from taxation of that part of property in excess of the formula established in section 105 of Referendum 47. The Department contends that the legislative authority to enact such programs is found in the language

of article VII, section 1 that "[s]uch property as the legislature may by general laws provide shall be exempt from taxation."

██ ██ The Assessors reply that value averaging is not a tax exemption but a discriminatory assessment scheme which selectively and unreasonably favors owners of rapidly appreciating property by forcing all other property owners to pay more than their uniform share of tax. They argue that value averaging was not presented to the public as a tax exemption for owners of rapidly appreciating property at the expense of other owners and, if it had been, the measure would have been defeated at the polls. They also argue that article VII, section 1 authorizes the Legislature to exempt property from tax, not to exempt part of the value of selected parcels of property from tax. Value averaging does not designate any type of property for exemption; instead, it changes the level of assessment for properties which are rapidly appreciating in value.

We agree with the Assessors that value averaging was not presented to the voters as an exemption from taxation.

International Association of Assessing Officers standard 5.3.1 defines property tax exemptions:

> Property tax exemptions are subsidies to certain owners or for certain uses or property, to encourage publicly desired objectives. A key principle of property tax systems is that all property is taxable unless it is specifically exempt, and exemptions are to be narrowly construed . . . .

International Ass'n of Assessing Officers, *supra*, at 37.

In Washington, there are many exemptions from property taxes. While article VII, section 1 requires taxes on real property to be uniform, there are exceptions to this in the state Constitution. Article VII, section 1 exempts public property, including federal, state, county and municipal, from real estate taxes. Article VII, section 10 (amendment 47) provides that notwithstanding the provisions of article VII, sections 1 and 2, the Legislature shall have the power to grant to retired property owners relief from the property

tax on real property occupied as a residence and the Legislature may limit such relief to those owners below a specific level of income. Article VII, section 11 (amendment 53) permits special valuation of farms, agricultural lands, timberlands, and certain other open space lands.

The statutory exemptions, most of which are codified in RCW 84.36, include such property as: churches and parsonages; certain nonprofit organizations for veterans, blood banks, public meetings, daycare, homes for the sick, libraries, hospitals, care for the aging, housing for the homeless, training of medical staff, rebroadcasting of signals by government agencies; schools; art, scientific or historical exhibits; humane societies; distribution of water; conservation of ecological systems or open space; and sheltered workshops for the handicapped. Nonprofit organizations for conservation of agriculture and nonprofit organizations used to solicit donations for character building, benevolent, protective and rehabilitative social services are exempt. Certain space dedicated to the public use is partially exempt, as are cogeneration facilities and property used for the production of alcohol fuels. By statute (and by specific constitutional grant of authority to the Legislature), disabled or retired persons with low income have some exemptions from taxation for their residences, and timberlands may be taxed on use rather than on an ad valorem basis. Qualifying multi-unit housing in urban centers with insufficient housing can obtain a 10-year exemption for the value of construction, conversion or rehabilitation. Historical properties may obtain an exemption for 10 years for the cost of rehabilitation. RCW 84.36, 84.14, 84.33, 84.26; Agreed Facts 401-25. The Department of Revenue points to these numerous exemptions allowed to certain real property by the Legislature to argue this Court should recognize the value averaging formula as a tax exemption.

These exemptions fall in basically three classes: where the exemption is defined by some characteristic of the property owner (i.e., low-income, retired or disabled); use of the property creates the exemption (i.e., homes for the sick, ag-

ing or homeless); or the use to which the property is put meets some public need or encourages a publicly-desired use (i.e., historical landmark or timber preservation). The Department of Revenue relies on a statute which gives a three-year exemption for certain improvements to single family dwellings. That statute has never been challenged; whether that exemption would withstand scrutiny under a uniformity challenge is not before us. More importantly, it was clear in that statute that the Legislature was intending to create an exemption, as the statute very clearly states that such property is "exempt" from taxation. RCW 84.36.400. The Department also refers to the deferral of tax for the costs of rehabilitation of historical properties, and the 10-year exemption for the value of new multiple-unit dwellings in urban counties which are without sufficient housing. RCW 84.26, 84.14.020. These exemptions have as their purpose the preservation of historical landmarks, which the Legislature found was in the public interest, and the creation of residential units in urban centers which have insufficient housing. RCW 84.26.010; 84.14.005, .007. Again, the legislative intent to exempt was clear.

While the Legislature, or the people in their legislative role, may exempt property from taxation, the question before us is whether an exemption was created in Referendum 47. This Court has long held that exemptions from taxation must be clear. Shortly after enactment of amendment 14 to article VII, section 2, this Court explained:

> Taxation is the rule, and exemption is the exception. Where there is an exception, the intention to make one should be expressed in unambiguous terms.

> "Statutes exempting property from taxation must be strictly construed, and it devolves upon those claiming the exemption to clearly show that the property is within the statute. All presumptions are against an intention of the State to bind itself by the exemption of property from taxation. . . ."

*Spokane County v. City of Spokane*, 169 Wash. 355, 358, 13 P.2d 1084 (1932) (citations omitted).

In ruling on the applicability of a real property exemption, we explained:

> Rather, it has been the well settled rule in this state for over 70 years that the court will find an exemption from taxation only where the legislature has authorized such by clear and explicit language; statutes exempting persons or property from taxation are to be strictly construed. *Thurston County v. Sisters of Charity of House of Providence*, 14 Wash. 264, 265, 44 P. 252 (1896). More recently, in *Pacific Northwest Conference of the Free Methodist Church of North America v. Barlow*, 77 Wn.2d 487, 492, 463 P.2d 626 (1969), we noted the rationale underlying the rule that exemptions are not to be extended by judicial construction to property other than that which is expressly designated by law:
>
>> It is widely recognized that tax exemptions create inequities in the distribution of the tax burden, even where the exempted property is being used for some function which it would be the duty of the state to perform if it were not performed by private individuals or organizations. This is so because rarely are the benefits of an exempted property conferred only upon those who must bear the increased tax burden. . . . Not only does the granting of exemptions result in an unequal distribution of the tax burden, but it also reduces the amount of revenue available to the governing body through reduction of the tax base.

*Pacific N.W. Annual Conference of the United Methodist Church v. Walla Walla County*, 82 Wn.2d 138, 140-41, 508 P.2d 1361 (1973) (footnote omitted). *See also City of Kennewick v. Benton County*, 131 Wn.2d 768, 777, 935 P.2d 606 (1997) (Sanders, J., dissenting) (citing to cases holding that any legislative intention to create a tax exemption must be expressed in clear and unambiguous terms).

In explaining the rationale for our rule of strict construction in *Pacific N.W. Conference of Free Methodist of N. Am. v. Barlow*, 77 Wn.2d 487, 494 n.3, 463 P.2d 626 (1969), we noted the testimony of the Director of the Department of Revenue that "[l]egal exemptions from tax are generally harmful to the community as a whole and create limitations upon public revenue which would properly be available without forcing increased rates."

Under the rationale of this line of cases, we conclude that since an exemption cannot be extended by ambiguous language, it should not be created by language that does not clearly create an exemption. 16 EUGENE McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 44.67, at 254 (3d rev. ed. 1994) explains:

> Where one relies on exemption from taxation, both the power to exempt and the intention to exempt must be clear. No presumption or intendment in favor of exemptions will be made unless plainly and unmistakably warranted by the letter and spirit of the law granting the exemption. On the contrary the prevailing doctrine is that any doubt or ambiguity must be resolved in favor of the public. As has frequently been stated, exemptions are not favored, and will not be allowed unless it clearly appears that such was the statutory intent.

(Footnotes omitted.) Nothing in Referendum 47 or in the 1997 VOTERS PAMPHLET labels or describes this method of assessing value as an exemption from taxation. In fact, a contrary intent appears based on the language of section 102 of the referendum. Section 102 of the referendum states:

> "Assessed value of property" shall be held and construed to mean the aggregate valuation of the property subject to taxation by any taxing district as determined under section 105 of this act [the value averaging formula], *reduced by the value of any applicable exemptions* . . . .

LAWS OF 1997, ch. 3, § 102 (emphasis added).

This language is a strong indication that the method of assessment was not intended as an exemption. Another section of Referendum 47, section 124, does amend an exemption for nonprofit homes for the aging. The language in section 124 is clear and provides that such property is "exempt from taxation." LAWS OF 1997, ch. 3, § 124; VOTERS PAMPHLET 38 (1997). The drafters of Referendum 47 knew how to exempt property from taxation and did not do so in section 105.

International Association of Assessing Officers standard 5.2 explains that "[t]he state legislature establishes the framework for the distribution of property taxes by provid-

ing for classification, exemption, and valuation." International Ass'n of Assessing Officers, *supra*, at 36. We conclude from a review of Referendum 47 and the 1997 VOTERS PAMPHLET that the value averaging formula is a part of the valuation process and not an exercise of the legislative choice to exempt property from taxation. Additionally, the International Association of Assessing Officers standards treat "exemptions" differently from such devices as "value averaging," which they describe as "valuation increase limits." *Compare* International Ass'n of Assessing Officers std. 5.3 *with* International Ass'n of Assessing Officers std. 5.4.3. The International Association of Assessing Officers standards do not consider valuation limits to be tax exemptions.

The Department of Revenue cites to *State ex rel. Atwood v. Wooster*, 163 Wash. 659, 2 P.2d 653 (1931), for the proposition that the legislative authority to exempt property from taxation is wholly independent of the uniformity requirement. However, the issue before us is not whether an exemption is insulated from the uniformity requirement but whether the value averaging formula is an exemption at all.

We conclude value averaging was not explained to the voters as an exemption from taxation. Exemptions may not be created by implication. We conclude value averaging is an assessment formula and not a tax exemption.

Since the value averaging formula was not enacted as an exemption from taxation, if the formula results in nonuniform taxes within the class of real estate, it will violate article VII.

### Uniformity and Cyclical Revaluation

■■ ■■ As discussed above, article VII requires that all taxes must be uniform within a class of property and all real estate must be one class. Value averaging does not assess all real property uniformly. Nonetheless, the Department of Revenue argues that this Court has not required strict uniformity in the taxation of real estate. The Depart-

ment relies on cases that hold that cyclical assessment is constitutionally acceptable. As noted above, some counties revalue individual parcels of real property in cycles rather than yearly.[4] In *Carkonen v. Williams*, 76 Wn.2d 617, 632-33, 458 P.2d 280 (1969), we held that cyclical revaluation of property is compatible with the constitutional uniformity provision, "provided [such programs] be carried out systematically and without intentional discrimination." We recognized that the assessors' staffing levels were completely inadequate to permit annual inspection and revaluation of all parcels of real property in the county. *Carkonen*, 76 Wn.2d at 622. We concluded that the sheer physical problem of annually inspecting property, coupled with the staff and budgetary allocations, allows the cyclical approach. *Carkonen*, 76 Wn.2d at 632. *See also Morrison v. Rutherford*, 83 Wn.2d 153, 154-55, 516 P.2d 1036 (1973).

In *Dore v. Kinnear*, 79 Wn.2d 755, 763, 489 P.2d 898 (1971), we reaffirmed the importance of the uniformity provision of the state Constitution, reaffirmed our holding in *Carkonen*, and held that the failure of a county assessor to revalue property in accordance with the four-year reassessment program put a disproportionate burden on some property owners as compared to others. Where a cyclical program of revaluation is undertaken, a systematic and consistent program of revaluation must be maintained during each year of the cyclical period in a county. We noted that the millage[5] to be levied by the county each year is dependent upon the revenues needed to meet the expenditures of the county and other taxing districts and that the failure

---

[4]Twenty counties currently revalue property on a four-year cycle, during which cycle such counties normally revalue approximately one-quarter of the real property in each year of the four-year cycle. One county revalues real property on a three-year cycle and one on a two-year cycle. During the interim years of the cycles, in those counties which are on a two-, three-, or four-year revaluation cycle, the current appraised values of the properties outside the current revaluation area remain constant unless the property is segregated or new improvements are made. Agreed Facts 315-18. Seventeen counties annually revalue real property. Agreed Facts 324-25.

[5]Millage is a tax rate expressed as mills per dollar. One mill is one-tenth of one cent. International Ass'n of Assessing Officers, *Standards on Property Tax Policy, in* ASSESSMENT JOURNAL, Sept.-Oct. 1979, at 44.

of the assessor to revalue more than a small percent of the taxable property in the county in the first year of the four-year period would require a higher millage than would have otherwise been required had a systematic revaluation been made. This then would place an additional disproportionate burden on the owners of the reevaluated property. *Dore*, 79 Wn.2d at 763-64. This is similar to the argument made by the Assessors regarding the effect of value averaging. *See also Valentine v. Johnston*, 83 Wn.2d 390, 394, 518 P.2d 700 (1974) (explaining that the common thread of the cyclical revaluation cases was that the entire revaluation program must be systematic and without discrimination). In *Sator*, 89 Wn.2d at 344, we reiterated that if the four-year revaluation program is conducted in an orderly manner and pursuant to a regular plan, and if it is not done in an arbitrary, capricious or intentionally discriminatory manner, then it does not violate the Constitution nor does any incidental inequality which flows from it.

While we have allowed systematic, nondiscriminatory cyclical revaluation for practical reasons, we have consistently enforced the mandates of uniformity required by article VII. In *Inter Island Tel. Co. v. San Juan County*, 125 Wn.2d 332, 883 P.2d 1380 (1994), one corporate taxpayer was being assessed at 100 percent of the value of its property while other taxpayers were being assessed on only 64 percent to 77 percent of the value of the same class of property. In attempting to defend this apparent inequity, the county relied upon the cases from this Court which authorized cyclical valuations. In *Inter Island*, we noted that those cases involved the "unique problems of cyclical valuations" and recognized that absolute uniformity had not been required. However, we held that this generalization does not permit assessments at 100 percent of value when other property in the class was assessed at 22 to 36 percent below value. *Inter Island*, 125 Wn.2d at 336-37. This is precisely what occurs under the value averaging formula. We explained:

> We have held consistently tax uniformity is "the highest

and most important of all requirements applicable to taxation under our system". *Savage v. Pierce County*, 68 Wash. 623, 625, 123 P.2d 1088 (1912); *Boeing Co. v. King County*, 75 Wn.2d 160, 165, 449 P.2d 404 (1969).

The fundamental requirement of uniformity controls even though a particular property in fact is valued at its true market value. "If the basis of valuation is the true market value of the property, then that basis must be applied to all alike. If the basis is a certain per cent of the true market value, the same percentage must be applied to all alike." *Pacific Tel. & Tel. Co. v. Wooster*, 178 Wash. 180, 184, 34 P.2d 451 (1934).

*Inter Island*, 125 Wn.2d at 334-35 (emphasis added).

Value averaging pursuant to Referendum 47 is essentially different than systematic cyclical reappraisal of property. In a four-year cycle county, each and every parcel of property must be reappraised every fourth year and then every parcel enjoys three years of being frozen at that appraised value. All property is treated the same and enjoys the same advantages. However, in the value averaging formula, only a subclass of property enjoys a nonrecognition of value and this advantage can continue indefinitely if the property continues to appreciate. Value averaging does not defer tax in one year and recoup it later or allow it to be spread over several years; rather, it shifts tax to other property owners. Because each year's tax liability is a separate debt, the tax preference granted to rapidly appreciating property is shifted to other owners in that given year. This tax shift is not remedied in future years and the favored property never pays back the nonrecognized taxes that were not billed.

The Department of Revenue also argues that property has not historically been assessed in accord with the constitutional requirements. While this is accurate, particularly with regard to the 50 percent assessment rule of former article VII, section 2 (amendment 17), this Court has continually warned assessors to meet those requirements. In *Snohomish County Bd. of Equalization v. Department of Revenue*, 80 Wn.2d 262, 263, 493 P.2d 1012, *appeal*

*dismissed*, 409 U.S. 810 (1972), we recognized there had been a long history of noncompliance with the former article VII, section 2 requirement that an assessed valuation be 50 percent of fair value. In that case, the Court allowed a temporary deviation from the 50 percent requirement but warned that "no further deviation will be tolerated." We reiterated the constitutional mandates of article VII, section 2 and sternly warned: "It would seem scarcely necessary to remind *all* public officials in all branches and levels of government that they have taken an oath to support the Constitution of the State of Washington." *Snohomish County*, 80 Wn.2d at 264. Similarly, this Court in *Morrison*, 83 Wn.2d at 155, warned that once the four-year program was completed, there would be "no more room in the constitution for anything less than full application of the constitutional mandate of uniformity."

While allowing for the practical problems of the cost of reappraisal and recognizing some assessors' historical underappraisal of property, we nonetheless have consistently interpreted article VII to require uniformity of taxes within the class of real estate. In *State ex rel. Barlow v. Kinnear*, 70 Wn.2d 482, 423 P.2d 937 (1967), we considered both the article VII, section 1 uniformity requirement and the former article VII, section 2 requirement that assessed valuation of property be 50 percent of value. While the Court split on the issue regarding section 2, we were unanimous in holding that assessment of some real property within the county at 20 percent of market value and other real property at 25 percent violated the uniformity provision of article VII, section 1. Finding that the tax ratio employed by the assessor was not uniform throughout the county, we held that "[t]his ratio must be uniform and apply equally to the same class of property within the territorial limits of the taxing authority." *Barlow*, 70 Wn.2d at 488.

In *Bond v. Burrows*, 103 Wn.2d 153, 156-57, 690 P.2d 1168 (1984), we explained:

> One fundamental premise pervades the constitutional limitations on the exercise by the Legislature of the power of taxa-

tion. This premise is that the distribution of the burdens of taxation should be uniform. *See* Const. art. 2, § 28(5), (10); Const. art. 7, § 1 (amend. 14); and Const. art. 11, § 9. While the taxing authority is free to impose different tax burdens on different classes, the rule requires that taxation of a class shall be uniform within the limits of the authority levying the tax . . . . *See Black v. State*, 67 Wn.2d 97, 406 P.2d 761 (1965); *Morrow v. Henneford*, 182 Wash. 625, 47 P.2d 1016 (1935); *State v. Hart*, 125 Wash. 520, 217 P. 45 (1923); *State ex rel. Mason Cy. Logging Co. v. Wiley*, 177 Wash. 65, 31 P.2d 539 (1934); *State ex rel. Atwood v. Wooster*, 163 Wash. 659, 2 P.2d 653 (1931).

*See also Burlington N., Inc. v. Johnston*, 89 Wn.2d 321, 334, 572 P.2d 1085 (1977) (reiterating that the constitutional requirement of uniformity, Constitution article VII, section 1 (amendment 14), is more insistent than the requirement of article VII, section 2 (amendment 17) that property be valued at 50 percent of its true and fair value); *State ex rel. Morgan v. Kinnear*, 80 Wn.2d 400, 401, 494 P.2d 1362 (1972) (since statehood, in the hope of attaining uniformity and equity, land has been valued for tax purposes in this state at its fair market value; the goal has always been: real estate taxes fairly assessed and uniformly applied); *Mason County Logging*, 177 Wash. 65 (while the rule prescribing general uniformity regardless of class of property was abolished by amendment 14, uniformity is still required within the classes). We conclude that our cases allowing cyclical assessment of property do not support the Department of Revenue's position that value averaging is constitutional.

## Equal Protection

The Assessors have made no equal protection challenge to Referendum 47, but the Department of Revenue urges this Court to use the rational basis test of equal protection analysis to decide if the law violates the Washington Constitution's uniformity requirement. The Department cites to other states' cases which indicate that the requirements of tax uniformity under their state constitutions are

"similar" to equal protection requirements. From this, the Department cites to the Supreme Court case upholding California's property tax scheme, which is a novel acquisition-value taxing system. *Nordlinger v. Hahn,* 505 U.S. 1, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992); *see* Mary LaFrance, *Constitutional Implications of Acquisition-Value Real Property Taxation: The Elusive Rational Basis,* 1994 UTAH L. REV. 817. In *Nordlinger,* the Court considered a challenge to California's Proposition 13 based on the Equal Protection Clause of the Fourteenth Amendment. Unlike Referendum 47, Proposition 13 had amended the California Constitution to eliminate current value taxation. LaFrance, *supra,* at 822. California's Proposition 13 method of assessment is intentionally nonuniform and has created dramatic disparities in the taxes paid by persons owning similar pieces of property. *Nordlinger,* 505 U.S. at 6. The *Nordlinger* Court merely upheld Proposition 13 against a "minimum scrutiny" challenge under the federal Equal Protection Clause.

In AGO No. 5, the Attorney General considered whether an acquisition valuation scheme such as California's Proposition 13 would run afoul of this state's Constitution and concluded:

> Although the acquisition method does not violate the Equal Protection Clause of the U.S. Constitution, we are convinced that it would violate the uniformity requirement of Amendment 14 of the State Constitution. Under equal protection analysis, there is no violation if there is a rational basis for the difference in treatment. However, there is no rational basis exception to the uniformity requirement of Amendment 14. The only discrepancies in uniformity that will be tolerated are those required by the practical necessities of revaluing property when the program is carried out "in an orderly manner and pursuant to a regular plan, and if it is not done in an arbitrary, capricious or intentionally discriminatory manner." *Sator,* 89 Wn.2d at 344.

5 Op. Att'y Gen. 16 (1995). We agree with this position.

Arguing that all that is required to satisfy this state's

Constitution is a rational basis for classification ignores a century of this Court's cases requiring uniformity of taxation under article VII of the state Constitution and ignores our state Constitution's requirement that all real estate be one class of property. We have treated uniformity challenges very differently than equal protection challenges in taxation cases. *Compare Inter Island*, 125 Wn.2d 332, *with Forbes v. City of Seattle*, 113 Wn.2d 929, 785 P.2d 431 (1990). We decline the invitation to ignore our own constitutional uniformity requirement and apply only the protections provided by federal equal protection law. Referendum 47 was not an amendment to the state Constitution and cannot, therefore, abolish or alter the uniformity requirement of article VII, section 1.

## CONCLUSION

The effect of value averaging is that owners of property with rapidly increasing value need not pay taxes at the same assessment ratio as owners with less rapidly appreciating property. Owners of less rapidly appreciating property would have to pay taxes on 100 percent of the fair market value of their property, while the owners of rapidly appreciating property would pay taxes on a lesser percentage of their property's value. Since in any given tax year the total tax burden stays the same, taxes are effectively shifted to owners of property with less rapidly increasing or with depreciating values. This violates the uniformity requirement of CONSTITUTION article VII, section 1 (amendment 14). The ratio assessment must be uniform within any class of property. If the basis of valuation is the fair market value of the property, then that basis must be applied to all other property in the same class; if the basis is a certain percent of the fair market value, the same percentage must be applied to all other property in the class. The value averaging formula intentionally applies different assessment ratios to different parcels of real property. Since proportionate taxation cannot exist without uniformity of assessment, the value averaging scheme violates the constitutional uniformity requirement.

We grant the Assessors' petition for a writ of mandamus. We hold that the limitation formula for increases in assessed value in section 105 of Referendum 47 is unconstitutional and void. We order the Department of Revenue to calculate the assessment ratios for real property in each county without regard to the limitation formula contained in section 105.

DURHAM, C.J., and DOLLIVER, SMITH, JOHNSON, MADSEN, ALEXANDER, TALMADGE, and SANDERS, JJ., concur.